ERNEST H. WEIGMAN AND BEULA D. WEIGMAN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3559–64.   Filed March 17, 1967.

*E. F. Rucker*, for the petitioners.
*Sheldon M. Sisson*, for the respondent.

DAWSON, *Judge:* Respondent determined the following income tax deficiencies against petitioners:

| Taxable year | Deficiency |
| --- | --- |
| 1958 | $21,593.31 |
| 1959 | 4,619.79 |
| 1960 | 1,161.53 |

The primary issue for decision is whether the petitioners are entitled to deduct as a loss incurred in the operation of a trade or business amounts loaned by them to the Bird Cage Restaurant & Cocktail Lounge, Inc., a wholly owned corporation. A subsidiary issue is whether the petitioners are entitled to a business bad debt deduction. Petitioners claimed a loss for the year 1961 in the amount of $158,669.67 and the deficiencies, as determined by respondent, arose solely from the disallowance of a carryback of the claimed loss to 1958, 1959, and 1960.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

The petitioners, Ernest H. Weigman and Beula D. Weigman, reside at 2626 Camino Principal, Tucson, Ariz. They filed their joint Federal income tax returns for the taxable years 1958 through 1961 with the district director of internal revenue at Phoenix, Ariz.

Petitioner Ernest H. Weigman (hereinafter referred to as Weigman) lived in Chicago, Ill., until September 26, 1956, when he moved to Tucson, Ariz. While in Chicago, and from 1942, Weigman owned and operated a corporation called Champion Railway Specialties Corp., which was engaged in the sale of railway supplies. Among

other things, that corporation sold mechanical supplies and parts used on railroad freight cars and locomotives such as handbrakes, draft gears, running boards, mats, belts, and miscellaneous items.

Upon leaving Chicago for Tucson, Weigman liquidated the railway supply corporation but retained personally some of the railroad accounts.

As shown in his tax returns for the years in issue, Weigman's activities with respect to the railway supply business after moving to Tucson were of a steadily diminishing nature and were carried out under the name of E. H. Weigman Railway Supply Co., a sole proprietorship located at 2626 Camino Principal, Tucson, Ariz. This address is the same as that shown as the principal residence of petitioners.

Weigman's gross and net profits from his railway supply activities, as shown in his income tax returns for 1958 through 1961, were as follows:

| Year | Gross profit | Net profit |
|------|-------------:|-----------:|
| 1958 | $23, 005. 86 | $9, 422. 61 |
| 1959 | 10, 781. 12 | 3, 869. 40 |
| 1960 | 8, 122. 73 | 3, 278. 87 |
| 1961 | 3, 620. 05 | 276. 34 |

Weigman's income tax returns for the years 1958 through 1961 show his occupation as "salesman."

The Bird Cage Restaurant & Cocktail Lounge, Inc. (sometimes referred to herein as Bird Cage), was incorporated in Arizona in June 1960. It began business on August 20, 1960, in a leased building located at 4915 North Scottsdale Road in Scottsdale, Ariz.

Gerald O'Dell, a nephew of Beula Weigman first brought the restaurant, known as the Bird Cage, to the attention of the Weigmans and invited them to invest in the corporation. At that time, Gerald O'Dell and William Bird were the only subscribing stockholders of the corporation. Bird was the operating manager of the restaurant.

The Weigmans purchased a one-third share of the stock of the Bird Cage after it had commenced business. On some undisclosed date after the Weigmans purchased stock in the Bird Cage, Weigman became president of the corporation.

The financing plan whereby the Weigmans became part owners of the corporation called for a stock investment of $5,000 each by Bird, O'Dell, and Weigman plus a loan of $10,000 each to the corporation. Both Weigman and Bird made their investment and loan but O'Dell failed to make either his investment or loan.

Under the agreement whereby the Weigmans became stockholders, it was expected that O'Dell would share in the responsibilities of running the business. However, he had other interests and was often

away from the Bird Cage. Upon being challenged on this point, he expressed a desire to get out of the corporation, offered his stock for sale and Weigman agreed to purchase it.

On or about October 6, 1960, Weigman acquired O'Dell's interest, paying $5,000 to cover O'Dell's stock subscription and making the required $10,000 loan. This left Bird, Weigman, and their respective wives as sole shareholders in the corporation. Although the Weigmans were not familiar with the restaurant business, they came in, surveyed and studied the operation and, by late fall of 1960, drew the conclusion that it was not being operated as it should.

The Weigmans offered suggestions for changes in operating methods and criticized certain procedures which had been instituted by Bird. As a result, Bird became indignant and offered to step out of the corporation entirely and sell his stock to the Weigmans. They accepted and became the sole stockholders of the corporation around the first of March 1961. On February 5, 1961, the Weigmans made a $500 downpayment in cancellation of Bird's manager contract.

The effect of the acquisition by the Weigmans of O'Dell's and subsequently Bird's interest in the Bird Cage was the elimination of one shareholder who had failed to live up to the terms of the original agreement and later the remaining shareholders with whom the Weigmans were at variance with respect to operating methods. From that time until the restaurant failed in late 1961, the Weigmans personally devoted much of their time and efforts to the operation of the restaurant in an attempt to make it a successful going business. No meetings of directors or stockholders of the Bird Cage Restaurant & Cocktail Lounge, Inc., were thereafter held nor any purported meetings of stockholders or directors.

Sally Graves owned the building occupied by the Bird Cage. She would not lease the premises to a corporation, but desired the individual or individuals in control of the business to be personally obligated. Initially, William Bird had been the lessee. However, on March 1, 1961, a new lease was executed by the Weigmans in their personal capacities. Among other things, the lease provided initially for a base monthly rental of $1,000. Additionally, there was to be a bonus payment which was measured by 4 percent of the past month's sales in excess of the base monthly payment. If sales exceeded $40,000 per month the percentage to be used was 5 percent. The lease was for a period of 10 years, commencing on March 1, 1961, and ending inclusive of February 28, 1971. Based on a $1,000 monthly rental for the 10-year period, the Weigmans' minimum aggregate personal liability under the terms of the lease if fully executed was approximately $120,000.

Shortly after the execution of the lease, Jack Gausner was employed to manage the restaurant. Gausner was responsible to Weigman in the performance of his duties.

At or about this time a number of creditors made demand for payment and Weigman placed additional funds into the business. Weigman also advanced various sums to establish working capital for the operation of the business.

At about the time Gausner became manager, the Weigmans assisted him and gained experience in the restaurant operation. Weigman worked closely with Gausner in the overall operation of the business, but with particular attention to certain of its aspects. Among them were the handling of the accounts, dealing with creditors, and the assumption of a good measure of responsibility with respect to the purchasing of supplies and the employment of operating personnel.

After Gausner became manager, the business continued to experience negative results, and it became apparent to the Weigmans that he could not meet their expectations with respect to the operation of the restaurant.

At some undetermined time early in 1961, Gausner's employment was terminated. A sublease was later entered into by the Bird Cage corporation with Sun Valley Management Co., Inc., to manage the business. Sun Valley was in the business of subleasing different businesses and operating them under special contracts. The agreement was for a period of 5 years and provided for the use by Sun Valley of the Bird Cage premises for the stated period and contained rental and other provisions, many of which were substantially the same as those contained in the lease between the Weigmans and Sally Graves, the owner of the premises. Jerry Engliss was the operating head of the Sun Valley Management Co., Inc., and also assumed management of the Bird Cage under the agreement. He was actively assisted in its management by the Weigmans.

Sometime in July, while the agreement between the Bird Cage and Sun Valley Management Co., Inc., was still in effect, the Weigmans assigned the lease of March 1, 1961, between themselves and Sally Graves to the Bird Cage. The assignment was approved in the same instrument by Sally Graves, the lessor, with the understanding that the approval did not release the Weigmans from any of their personal obligations under the lease.

The Sun Valley Management Co., Inc., also failed in its operation of the business, defaulted on the sublease, and the agreement with that corporation was terminated. Coterminous with or shortly thereafter, an arrangement was entered into by the Weigmans with Shirley Girard which was in substantial respects similar to the prior arrangement with the Sun Valley Management Co. As in their prior arrangements, the Weigmans assisted in the operation of the business.

The arrangement with Girard also proved unsuccessful. The Weigmans, through their corporation, acquired the services of Ray S. Jackson, a local restaurant manager of high reputation, sometime in October of 1961. Pursuant to Jackson's advice to change the name of the establishment, there was an assignment of the lease by the Bird Cage corporation to Jackson, doing business as Petite Cafe, Inc., on November 1, 1961. Among other things, the assignment provided that Jackson would perform all the terms, covenants, and conditions of the lease with Sally Graves, including the payment of rent, and holding the assignor, as well as the Weigmans, harmless from any and all obligations and duties enuring to it and them under that lease. Again, the Weigmans assisted in the operation of the business.

Jackson also defaulted on the sublease, and any further attempt to operate the business was suspended. The business was closed and disposed of sometime after January of 1962.

A schedule entitled "E. H. Weigman and Beula Dell Weigman Personal Loans to Bird Cage Corp." was prepared by Ernest Weigman subsequent to the filing of petitioners' joint Federal income tax return for 1961 and prior to the filing of the petition in this proceeding. It shows loans made to the corporation as follows:

| Date | | Amount |
|---|---|---|
| July 1, 1960 | | $10,000 |
| Oct. 6, 1960 | | 10,000 |
| Nov. 23, 1960 | | 10,000 |
| Feb. 5, 1961 | (partial payment to William Bird to cancel manager's contract) | 500 |
| Feb. 7, 1961 | (repay First National Bank loan) | 6,000 |
| Feb. 8, 1961 | (rent in arrears) | 2,000 |
| Feb. 15, 1961 | (March rent) | 1,800 |
| Mar. 2, 1961 | (liquor license) | 650 |
| Mar. 2, 1961 | (payment to William Bird to cancel manager's contract) | 7,000 |
| Mar. 3, 1961 | (for operating expense and obligations due and past due) | 15,000 |
| Mar. 10, 1961 | do | 20,000 |
| Mar. 25, 1961 | do | 10,000 |
| Apr. 6, 1961 | do | 18,000 |
| Apr. 24, 1961 | do | 2,000 |
| Apr. 26, 1961 | do | 1,000 |
| May 15, 1961 | do | 500 |
| May 22, 1961 | do | 2,000 |
| June 1, 1961 | do | 12,000 |
| June 7, 1961 | do | 1,000 |
| June 12, 1961 | do | 1,000 |
| July 1, 1961 | do | 1,000 |
| Aug. 1, 1961 | do | 2,100 |
| Aug. 10, 1961 | do | 1,700 |
| Sept. 1, 1961 | do | 2,000 |
| Sept. 30, 1961 | do | 1,000 |
| Oct. 2, 1961 | do | 400 |

| Date | | Amount |
|---|---|---|
| Oct. 18, 1961 | (for operating expense and obligations due and past due) | $ 500 |
| Oct. 31, 1961 | _____do_____ | 125 |
| Nov. 6, 1961 | _____do_____ | 3,000 |
| Nov. 6, 1961 | _____do_____ | 2,000 |
| Nov. 10, 1961 | _____do_____ | 4,500 |
| Nov. 6, 1961 | _____do_____ | 2,000 |
| Nov. 7, 1961 | _____do_____ | 2,500 |
| Nov. 25, 1961 | _____do_____ | 500 |
| Dec. 1, 1961 | _____do_____ | 550 |
| Dec. 29, 1961 | _____do_____ | 500 |
| | Total loans during 1960 and 1961 | 154,825 |
| Jan. 3, 1962 | (for operating expense and obligations due and past due) | 1,000 |
| Jan. 3, 1962 | _____do_____ | 400 |
| Jan. 3, 1962 | _____do_____ | 100 |
| | Grand total 1960, 1961, and 1962 | 156,325 |

The corporate bank account was used to receive funds from Weigman and used to pay out funds. All loans to the Bird Cage corporation were evidenced by canceled checks and interest-bearing notes.

The Bird Cage filed a corporation income tax return for the fiscal year beginning July 1, 1960, and ending June 30, 1961, with the district director of internal revenue at Phoenix, Ariz. This return was signed on August 29, 1961, by E. H. Weigman in his capacity as president of the corporation. The corporate return shows "Loans from stockholders" outstanding as of June 30, 1961, in the amount of $122,900. The corporate return also shows, *inter alia*, the following:

| | |
|---|---|
| Sales | $187,531.69 |
| Salaries and wages | 6,045.49 |
| Rents | 22,696.33 |
| Taxes | 4,671.17 |
| Depreciation on various property | 10,771.12 |
| Music and entertainment | 15,633.46 |
| Insurance | 3,811.31 |
| Legal and audit | 7,487.18 |
| Merchandise purchased | 69,549.11 |

The return shows a loss of $68,978.45 for the fiscal year ended June 30, 1961.

On the petitioners' joint Federal income tax return for 1961 a loss in the operation of the restaurant business was claimed in the amount of $158,669.67 as follows:

*Interest expense*

| | |
|---|---|
| 1st Natl Bank—Scottsdale | $965.00 |
| W. F. Weigman | 293.32 |
| J. R. Weigman | 900.00 |
| | $2,158.32 |

*Travel Expense*

| | |
|---|---|
| Fares ------------------------------------------------- | $105. 24 |
| Meals and lodging------------------------------------- | 1, 060. 92 |
| Car rent----------------------------------------------- | 9. 78 |
| | |
| Total travel------------------------------------------- | $1, 175. 94 |
| Telephone -------------------------------------------- | 510. 41 |
| Loss on notes----------------------------------------- | 154, 825. 00 |
| | |
| Total loss-------------------------------------------- | 158, 669. 67 |

Petitioners attached a Schedule C, Profit (or Loss) From Business or Profession, to their 1961 income tax return covering the wholesale railway supplies business, but none for the restaurant business.

An application for a tentative carryback adjustment was filed on March 13, 1962, for the year 1961. A refund (exclusive of interest) was received by the petitioners around April 10, 1962, for each year as follows:

| *Year* | *Amount* |
|---|---|
| 1958---------------------------------------------- | $21, 593. 31 |
| 1959---------------------------------------------- | 4, 619. 79 |
| 1960---------------------------------------------- | 1, 161. 53 |

Weigman received no salary and took no compensation from the Bird Cage operation in 1960 or 1961. He was not an employee of the corporation.

In his notice of deficiency the respondent disallowed the $158,669.67 deduction claimed as a loss sustained in the operation of the restaurant business in 1961 on the ground that petitioners had not established that they were entitled to such a deduction in that year as a result of advances made to the business.

The petitioners did not operate the Bird Cage as a sole proprietorship in 1961. The Bird Cage was a bona fide, viable corporation in 1961 which was engaged in carrying on business activity.

The loans made to Bird Cage in 1961 by petitioners were not related to a trade or business of being an employee. Ernest Weigman had no trade or business of lending money or of financing corporations.

The amount of $158,669.67, representing loans to the Bird Cage corporation, did not constitute an ordinary business loss or a business bad debt, in whole or in part, to petitioners in 1961.

OPINION

The principal issue raised in this case is whether the petitioner, Ernest H. Weigman, operated the Bird Cage restaurant as a sole proprietorship after about March 1, 1961, so that amounts advanced by him and his wife to operate the restaurant can be treated as losses sustained in the operation of *his* business. The pertinent provisions

of the statute relating to the deduction of losses are set out below.[1]

Petitioner contends that he was the sole proprietor of the Bird Cage restaurant operation throughout most of the year 1961 and that the advances in question were made to his own business and not to the corporation. In other words, his position is that the contested advances constitute ordinary business losses. He acknowledges in his brief that the "presence of the corporation must be explained away in order for the taxpayers to sustain their position." Respondent counters with the contentions that the Bird Cage restaurant was operated in 1961 by the corporation and that Weigman cannot disavow, at this late date, the existence of the corporation and thereby claim the losses as a sole proprietor. In addition, the respondent maintains that Weigman is not entitled to a business bad debt deduction for the unrecovered funds because (1) he did not have to make loans to retain his job with the corporation; (2) he has no trade or business of loaning money; and (3) he has no trade or business of promoting corporations.

In our judgment the evidence contained in this record simply does not support the petitioner's assertions that the Bird Cage corporation was merely a conduit through which flowed the income earned and expenses incurred by him as an individual, that it served no business purpose and engaged in no business, and that it should be ignored.

While the doctrine of the separate entity of a corporation is not sacrosanct in determining income tax liability, it is usually respected except "in exceptional situations where it otherwise would present an obstacle to the due protection or enforcement of public or private rights." *New Colonial Ice Co.* v. *Helvering*, 292 U.S. 435, 442 (1934). See also *Bancker* v. *Commissioner*, 76 F. 2d 1 (C.A. 5, 1935), affirming 31 B.T.A. 14 (1934). And in the bellwether case of *Moline Properties, Inc.* v. *Commissioner*, 319 U.S. 436 (1943), where the taxpayer attempted to have the corporate existence ignored, the Supreme Court said (pp. 438–439) :

The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation [2] or to avoid [3] or to comply with [4] the demands of creditors or to serve the creator's personal or undisclosed convenience,[5] so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity. [Footnotes omitted.]

---

[1] SEC. 165. LOSSES.

(a) GENERAL RULE.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

\*　　\*　　\*　　\*　　\*　　\*　　\*

(c) LIMITATION ON LOSSES OF INDIVIDUALS.—In the case of an individual, the deduction under subsection (a) shall be limited to—

(1) losses incurred in a trade or business;

(2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and

In *National Carbide Corp* v. *Commissioner*, 336 U.S. 422 (1949), the Supreme Court commented that the Court of Appeals for the Second Circuit correctly held—

that under our decisions, when a corporation carries on business activity the fact that the owner retains direction of its affairs down to the minutest detail, provides all of its assets and takes all of its profits can make no difference tax-wise.

See also *Burnet* v. *Clark*, 287 U.S. 410 (1932); *Skarda* v. *Commissioner*, 250 F. 2d 429 (C.A. 10, 1957), affirming 27 T.C. 137 (1956); and *Chelsea Products, Inc.*, 16 T.C. 840 (1951), affd. 197 F. 2d 620 (C.A. 3, 1952).

Although it may have seemed in petitioner's mind that the restaurant operations were being carried on as if no corporation existed, which is not surprising in view of the manner in which the business was conducted, there are many corporate activities which cannot be disregarded. The corporation maintained a bank account in its name through which passed all checks issued (signed by the Weigmans) or received by the restaurant business. Salaries of employees were paid with corporate funds. The corporation issued stock, had officers, directors, and employees, kept books and records, paid rent, negotiated and signed leases, assignments and contracts, obtained licenses, had taxes levied against it, filed a Federal corporation income tax return, and existed as a viable corporation until it ceased doing business late in 1961. Moreover, after the petitioners filed their joint income tax return for the year 1961, Ernest Weigman prepared a schedule (stipulated Exhibit K) which lists the date and amount of every advance made to the Bird Cage corporation and characterizes each advance as a loan to the corporation. Each advance of funds is supported by an interest-bearing note.

A fair inference to be drawn from these facts and from the record as a whole is that the restaurant business was carried on by the corporation throughout most of 1961. Whether from honest bias or from determined obfuscation, the petitioner has tried, albeit unsuccessfully, to make his evidence fit a bed of Procrustes in his effort to shed the corporation. We cannot isolate Weigman's somewhat self-serving testimony to the exclusion of convincing documentary evidence to the contrary. Under the circumstances we cannot, like a jinni, cause the realities to disappear and find, as petitioner would have us do, that the corporation vanished in early 1961 and he then conducted the restaurant business as a sole proprietorship. Weigman was an experienced businessman who knew what he was doing while he owned and controlled the Bird Cage corporation during 1961. He did not sound taps over a lifeless corporation. He did not extricate himself from the corporation. Instead, he consciously chose to continue and operate the corporation throughout most of 1961. See *Omaha National*

*Bank* v. *Commissioner*, 183 F. 2d 899 (C.A. 8, 1950), affirming a Memorandum Opinion of this Court, which is factually similar to this case. Here the petitioner adopted the corporate form for purposes of his own. The choice of the advantages of incorporation to do business requires the acceptance of its tax disadvantages. *Burnet* v. *Commonwealth Imp. Co.*, 287 U.S. 415 (1932). When the petitioner became the sole stockholder of the corporation in March 1961, he could have voluntarily dissolved the corporation pursuant to section 10–361 et seq., Arizona Revised Statutes Annotated, and started anew as a sole proprietorship. But that he did not do. Unfortunately for him, the income tax predicament in which he now finds himself was of his own making and any attempt to wish it away now is insufficient. Accordingly, any losses sustained from the operation of the restaurant business are properly attributable to the Bird Cage corporation rather than to the Weigmans.

We also agree with respondent that Weigman was not in the business of lending money or financing corporations. See *Whipple* v. *Commissioner*, 373 U.S. 193 (1963). Actually, at the trial and in his brief, the petitioner makes no claim that he was in such business. To the contrary he has only contended that he was financing his own enterprise.

Section 166(a), I.R.C. 1954, allows as a deduction any debt which becomes worthless within the taxable year. However, this provision is limited by section 166(d) which restricts nonbusiness debts to the treatment accorded losses on the sale of short-term capital assets. A nonbusiness bad debt is a debt other than one the loss from the worthlessness of which is incurred in the taxpayer's trade or business. Since Weigman has not established to our satisfaction that the loans made to the Bird Cage corporation were incurred in *his* trade or business, it follows inexorably that the claimed bad debt was not a business bad debt and we so hold. Cf. *Eugene A. Mohr*, 45 T.C. 600, 611 (1966), and cases cited therein.

Reviewed by the Court.

*Decision will be entered for the respondent.*

---

TURNER, *J.*, dissenting: I feel compelled to dissent from the disposition of this case. Indulging in a display in semantics, relying on technicalities rather than reality and common sense and exalting form over substance, the Court, in my opinion, is depriving the petitioners of a deduction to which they are entitled both in fact and in law.

As the trier of the facts and having seen and heard the petitioner, Weigman, during the course of his testimony, it is my conclusion and finding that from the time of the acquisition by Weigman of Bird's

stock in the Bird Cage Restaurant & Cocktail Lounge, Inc., the Weigmans considered the operation of the Bird Cape Cocktail Lounge & Restaurant business as their personal business and it was so operated by them as their business throughout the remainder of the year, in which operation they sustained a loss of $118,825.

It is my opinion that the above finding is correct and proper whether or not the corporation technically or otherwise was still in existence and whether or not the title to any or all of the restaurant assets remained in it.

Prior to the time of Bird's departure from the business, he was manager of the business under a manager's contract which was for a term of 5 years. In the late fall of 1960, after the Weigmans had acquired O'Dell's interest by paying his stock subscription and making the $10,000 loan, the Weigmans after a study and survey of the operation drew the conclusion that the business was not being operated as it should. They offered suggestions for changes in operating methods and criticized certain procedures which had been instituted by Bird. As a result Bird became indignant and offered to sell his stock to the Weigmans and step out of the business entirely. They accepted and became the owners of all the stock and the operators of the business.

The exact date on which the Weigmans acquired Bird's stock and the price they paid for it are not clear. They did pay $7,500 for the cancellation of Bird's manager's contract with a $500 downpayment on February 5, 1961, and the remaining $7,000 on March 2 following.

Not having been experienced in the restaurant business, they undertook to obtain experienced managerial services. They first employed a man by the name of Gausner who proved to be a disappointment and on March 2 he was replaced by Jerry Engliss who was the operating head of Sun Valley Management Corp., which was in the business of operating businesses under contract. Thereafter during the year two other individuals were successively employed, each for a short time with equally disappointing results. From and after the acquisition of Bird's stock and the cancellation of his manager's contract, Weigman devoted his full time to the operation of the business. He handled the accounts and dealt with the creditors. He purchased supplies and materials and hired employees including waitresses, chefs, and bartenders. He assumed and paid the liabilities to creditors and suppliers. At no time did he seek protection from such liabilities behind the corporate entity. Not only that, but he was called on by the owner of the restaurant property to execute and he did execute a new lease in his individual capacity in place of the prior lease which had been executed by Bird. Assignment of the lease was permissible and a formal assignment was later made into the corporate name, but by the terms of the lease the individual liability of the petitioner covering

the occupancy and use of the premises by the restaurant and cocktail lounge business was specifically reserved.

Except in connection with the execution of the lease as outlined above petitioner at no time had the benefit of the advice and services of a lawyer. There was no recognition or indulgence in corporate formalities. There were no stockholders meetings, no directors were elected, and no directors meetings were held. It is true that there was no change in the style in which the bank account was carried, and the deposits and disbursements were made through the account which had been set up and used during the period of the corporate operation of the business. The corporation was not dissolved and there was no transfer of title and Weigman did prepare and file an income tax return on corporate form for the business covering the period from its inception in 1960 to July 1, 1961. Weigman could have of course readily avoided his present difficulties if he had dissolved the corporation and had not continued the use of the bank account in the corporate name, but at that time Weigman had other matters deeply on his mind and his time was fully taken in his efforts to finance and operate a restaurant and cocktail lounge business for which he assumed full liability.

On the facts, this is not a case such as *Whipple* and it is clearly distinguishable from *Omaha National Bank* v. *Commissioner*, 183 F. 2d 899, affirming a Memorandum Opinion of this Court, and *Eugene Mohr*, 45 T. C. 600. It is not a case as the respondent contends of a stockholder's claiming that he was in the business of making loans to corporations so as to make of the loss a business bad debt. The petitioner makes no claim that he was engaged in such a business. The claim is of a loss incurred in the operation of a business, a restaurant business operated by petitioner in respect to which he had made himself personally liable and was so liable.

More nearly this case falls within the ambit of *C. A. Ripley*, 26 T. C. 1203. In *Ripley* as was originally the situation here the corporation had multiple stockholders and the business operation was that of a corporation and no one else. It became a losing proposition and one of the stockholders, by agreement with the other stockholders, took over and operated the business for his own account, the only notable difference being that the corporation continued to have stockholders who were not participating in the operation or in the liabilities and losses. In this instance Weigman had become the only stockholder and there was no occasion for any formal agreement by Weigman with himself when he assumed the liabilities of operation and did operate the restaurant and cocktail lounge business individually. The losses were not bad debt losses, nonbusiness or otherwise, and in enact-

ing the nonbusiness bad debt provision of 166 (d) of the Internal Revenue Code I do not believe that Congress had any intention, thought, or idea that it was to cover losses such as this. See also *Kittle* v. *United States* (W.D. Tenn., 1966, 67–1 U.S.T.C. par. 9241).

The findings and opinion of the Court are written as if petitioners here were claiming as a business loss or business bad debt a deduction of $158,669.67. If he must lose his case I do not feel that he should be put in the light of claiming more than he is or something other than he is.

On their 1961 return petitioners did claim a deduction of $158,669.67 as a "Loss in conjunction with operation of Bird Cage Restaurant and Cocktail Lounge, Inc., of Scottsdale, Arizona." Of the $158,669.67 so claimed $30,000 represented payments into the corporation in 1960 to cover the Weigman and O'Dell stock subscriptions and the loans to be made in conjunction therewith. The remainder consisted of the $6,000 paid by the petitioners to the First National Bank on February 7, 1961, in satisfaction of a loan previously made by the bank to the corporation and $118,825 representing the losses sustained in the business in 1961 after petitioner Weigman acquired Bird's stock and began operating the business.

The losses alleged in the petition were limited to the $6,000 paid to the bank in February 1961 and the $118,825 thereafter lost during the year in the operation of the restaurant. At the trial and in the submission of the case, only the deduction of the $118,825 representing the loss incurred in 1961 in the operation of the restaurant and cocktail lounge business has been claimed.