George Cukor v. Commissioner.
Cukor v. Commissioner
Docket No. 3294-66.
United States Tax Court
T.C. Memo 1968-17; 1968 Tax Ct. Memo LEXIS 280; 27 T.C.M. (CCH) 89; T.C.M. (RIA) 68017; January 26, 1968, Filed *280 1. The board of directors of S Corp., petitioner's wholly owned corporation, resolved "to pay a cash dividend in the amount of $137,000" to P Corp. On the same day, shortly thereafter, petitioner exchanged all his stock in S Corp. for all the stock of P Corp., which had been created the day before, so that S Corp. became a wholly owned subsidiary of P Corp. P Corp. subsequently received the $137,000 cash dividend from S Corp., and another $4,000 dividend paid two and one-half months later. Held, P Corp. was a bona fide corporate entity, and the dividends it received from S Corp. are taxable to it alone and cannot be attributed to petitioner. 90 2. Petitioner gave a remainder interest in a painting to a university in 1962. Held, petitioner failed to prove that the painting had a fair market value in excess of that determined by the Commissioner. Earl C. Crouter, for the petitioner. Erwin L. Stuiler, for the respondent. BAUM Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency in petitioner's income tax for the calendar year 1962 in the amount of $133,089.17. The principal issue is whether petitioner constructively received and was properly taxable on $141,000 in cash dividends paid by a corporation in which he had been the sole stockholder where, immediately after the greater portion of the dividends had been declared but before anything had been paid, petitioner exchanged all his stock in the payor corporation for all the stock of a newly created corporation, which subsequently received all the cash dividends and used at least part thereof for business purposes. An unrelated issue involves a determination of the fair market value of a painting in which petitioner donated a future permanent interest *283 to a major university, retaining a life interest for himself. Findings of Fact The parties have filed two stipulations of fact which, together with accompanying exhibits, are incorporated herein by reference. Petitioner, George Cukor, is an unmarried individual who, during the year 1962 and at the time of filing the petition herein, resided in Beverly Hills, California. His income tax returns for the calendar years 1961 and 1962 were filed on the cash basis with the district director of internal revenue, Los Angeles, California. Petitioner is a prominent motion picture director. From 1929 to 1960, he performed his services as director under contracts with various motion picture producing companies, including Paramount, RKO, and Metro-Goldwyn-Mayer, which companies would also lend his services to other studios from time to time. Petitioner was highly paid for his work, and in 1961 his services commanded over $7,000 or $8,000 a week. G-D-C Enterprises, Inc. (hereinafter sometimes referred to as G-D-C), California corporation, was incorporated on March 28, 1960, and shortly thereafter petitioner became the owner of all its issued and out-standing capital stock. On June 1, 1961, he *284 entered into an employment contract with G-D-C. Under the terms of the contract, petitioner would, for a period of five years, render his services exclusively to G-D-C (except that he could fulfill his obligations under contracts entered into prior to the date of the agreement), and in return would receive the sum of $50,000 per year, beginning in 1963, every year for the rest of his life. [1] G-D-C was also given the right to lend petitioner's services to any motion picture producer. On June 26, 1961, G-D-C entered into a contract with Darryl F. Zanuck Productions, Inc., whereby G-D-C agreed to lend the services of petitioner as director for a film play entitled "The Chapman Report". Darryl F. Zanuck Productions, Inc. agreed to pay to G-D-C the sum of $7,307.69 per week as compensation for petitioner's services for a guaranteed period of not less than 26 weeks. Ninety percent of this "guaranteed compensation" was payable directly to G-D-C, less deductions and withholdings required by law. The remaining ten percent was payable on a deferred basis beginning in 1963 to Cukor's agent, Irving Paul Lazar, *285 referred to in the contract as "your agent". "The Chapman Report" was in fact produced and released. On October 16, 1961, G-D-C entered into a contract with Twentieth Century-Fox Film Corporation to lend the services of petitioner as director for the motion picture "Something's Got to Give" for a base period of not less than 26 weeks commencing after completion of petitioner's services on "The Chapman Report." As compensation for petitioner's services, G-D-C was to be paid $8,653.84 per week. Again, ten percent of the total compensation was payable to Irving Paul Lazar, and under this contract the ten percent was not payable until January 5, 1968. In addition, G-D-C was to receive "participation compensation" equal to 7 1/2 percent of the "net profits" that might accrue from the distribution of the motion picture. Petitioner, individually, warranted performance under the contract, and specifically agreed that he would look 91 solely to G-D-C for compensation for his services. "Something's Got to Give" was "called off" in the middle of production because of the illness of the leading female star, Marilyn Monroe. G-D-C received a settlement from Twentieth Century-Fox Film Corporation *286 with respect to petitioner's services in this motion picture which, however, was reported as income on petitioner's individual return for the calendar year 1962. G-D-C reported gross income in its tax return for the fiscal year ended July 31, 1962 of $438,587.98. Of this amount $344,740.35 (approximately 78 percent) was reported on the return as "Rents from Motion Pictures," but in fact represented fees resulting from the services of petitioner as a motion picture director. The remaining $93,847.63 of gross income reported by G-D-C in that year came from G-D-C's 28 1/3 percent interest in a joint venture known as Telserv, which purchased and operated telephone answering services. The managing partner in the Telserv joint venture was Julius Lefkowitz & Co., an accounting firm which represented petitioner as his business manager and guided him in business and tax matters. There were three other corporate participants in the Telserv venture; two of them were also clients of Julius Lefkowitz & Co. and the third was a corporation wholly owned by that firm which represented its participation in the venture. Telserv, which commenced doing business on November 1, 1960, operated on a fiscal *287 year ended July 31, as did G-D-C. Its total gross income and net profit or loss for the nine-month period ending July 31, 1961, and the years ended July 31, 1962 and 1963, were as follows: Period Ending 7/31
Gross Income
Net Profit (Loss)
1961 (9 mos.)
$120,064.42
[14,904.96)
1962 (1 yr.)
331,226.94
(35,522.95)
1963 (1 yr.)
453,379.68
1,803.43
On July 25, 1962, a corporation named Laurette Enterprises, Inc. (hereinafter sometimes referred to as Laurette) was organized in the State of New York. The following day, July 26, petitioner transferred all of his 1,000 shares of stock in G-D-C to Laurette in exchange for all of Laurette's stock, and G-D-C thereby became a wholly owned subsidiary of Laurette. Earlier on July 26, shortly before this exchange took place, the board of directors of G-D-C had resolved "to pay a cash dividend in the amount of $137,000 to Laurette Enterprises, Inc. as paid-in capital for the contemplated business operations of that organization." G-D-C in fact paid a cash dividend to Laurette in the amount of $137,000 on July 30, 1962, the day before the end of its fiscal year. An additional cash dividend of $4,000 was declared by *288 G-D-C and paid to Laurette on October 15, 1962. G-D-C treated both dividend payments as distributions from earned surplus on Schedule M of its corporate income tax returns for its fiscal years 1962 and 1963, and Laurette included the entire amount of both dividend payments in taxable gross income on its income tax return for the 52-53 week period from July 26, 1962 through July 31, 1963. Pursuant to section 243 of the Internal Revenue Code of 1954, however, Laurette deducted 85 percent of the dividends received from its taxable income, so that it paid tax on only 15 percent of the dividends received from G-D-C. On October 31, 1962, Laurette and five other investing corporations signed an agreement of joint venture with the General Bearing Co., Inc., a manufacturer of nonprecision ball bearings used in sliding doors and cabinets, which agreement in general gave the investing corporations a 40 percent share in General Bearing Co.'s business, and more specifically, gave Laurette a 3.4 percent share in the profits and losses of that business. An investigation of the General Bearing Co. had previously been made by Julius Lefkowitz & Co., and one of the corporate *289 participants, Larkspur Associates, Inc., was owned by that firm, and represented its participation in the venture. It was the understanding of petitioner that certain members of the firm of Julius Lefkowitz & Co. would devote their personal attention to the operation of General Bearing Co. to see that the business was operated efficiently, economically and profitably, and that no more than $50,000 would be invested in the venture by Laurette. Under the terms of the joint venture agreement, Laurette was to contribute $40,800 as its capital contribution to the joint venture, and, under the terms of another agreement, it was to lend $7,500 to Larkspur Associates, Inc. to help that corporation meet its capital contribution to the joint venture. The remaining cash required of Larkspur Associates, Inc. for its capital contribution was supplied proportionately through loans by the other members of the joint venture apart from General Bearing Co.; the repayment of all such loans was contingent upon conditions that in general turned upon the success of the venture. 92 On April 1, 1963, G-D-C transferred its interest in Telserv to Laurette. Neither Laurette nor G-D-C devoted any time to *290 Telserv's business. During the year 1962, petitioner donated to the University of Southern California at Los Angeles, California, the future permanent interest in a painting by the artist Georges Braque, known as "Still Life." The petitioner retained a life interest in said painting, and it still hangs in his home. This painting, which also was referred to as "Still Life, NATURE MORTE AU CRUCHE", was an "oil on canvas," 24 X 31 inches, and signed at the lower left. It was painted by the artist in 1941 and was purchased by petitioner in 1947 for $3,700. In computing the deduction in respect of the gift of the remainder interest on petitioner's 1962 return, the painting itself was valued at $85,000. The fair market value of the painting on the date of the gift was no more than $60,000, the amount used by the Commissioner in determining the deficiency herein. Opinion RAUM, Judge: 1. Petitioner, a successful motion picture director, was until July 26, 1962 the sole stockholder of G-D-C Enterprises, Inc., a corporation which loaned petitioner's services to various motion piture producers, collected the fees for such services, and made payments to petitioner in smaller annual amounts *291 on a deferred basis. On that date, petitioner transferred all his stock in G-D-C to a newly organized corporation, Laurette Enterprises, Inc., in exchange for all of Laurette's stock. On the same day, July 26, G-D-C declared a dividend of $137,000, which it paid to Laurette on July 30. G-D-C's fiscal year ended July 31. Two and one-half months after the close of its fiscal year, on October 15, G-D-C declared and paid another dividend to Laurette, this one in the amount of $4,000. Respondent determined that these two dividends, though paid to Laurette, were constructively received by petitioner, and therefore included $141,000 in petitioner's income for the taxable year 1962. Respondent advances two arguments in support of his theory that the dividends paid by G-D-C to Laurette were properly taxable to petitioner. First, he argues that the formation of Laurette and the exchange by petitioner of all his G-D-C shares for all the shares of Laurette was a sham which accomplished nothing except a reduction in petitioner's taxes, and therefore should be disregarded. Cf. Gregory v. Helvering, 293 U.S. 465, Higgins v. Smith, 308 U.S. 473. Second, he argues that *292 petitioner was still the owner of G-D-C's stock when it declared a dividend of $137,000 on July 26, 1962, and from this concludes that at least that amount was taxable to petitioner, notwithstanding his attempt to shift the tax burden by transferring his G-D-C stock to Laurette before the dividend was actually paid. Cf. Helvering v. Horst, 311 U.S. 112; Smith's Estate v. Commissioner, 292 F. 2d 478 (C.A. 3), affirming Mark G. Anton, 34 T.C. 842. Tying the two arguments together respondent concludes that petitioner, having been the true owner of G-D-C's shares when the dividends were declared, having had full power as G-D-C's sole stockholder to have had the dividends paid to him, but having instead had the dividends paid to another wholly owned corporation as the result of a sham transaction, has fully realized the benefit of the dividends and should be taxed on them under section 61. We disagree. We find great difficulty with the Government's effort to support the deficiency on the ground that this was a sham transaction. True, it requires no great perception to see that tax avoidance purposes played an important, if not the dominant role, *293 in arranging to have the compensation for Cukor's personal services as a director paid to his wholly owned corporation. Had the Commissioner undertaken to charge petitioner with that compensation as it was earned under the line of cases headed by Lucas v. Earl, 281 U.S. 111, a different problem would be presented. But he did no such thing. He accepted the arrangement, and has not challenged the existence of G-D-C or its use as a conduit to make petitioner's services available to motion picture companies. Indeed, the Commissioner's brief assumes that G-D-C was a viable corporate entity and seeks to show that since it was on the verge of becoming a personal holding company as its income from petitioner's personal services approached the statutory 80 percent limit, [2] the dividend to Laurette was intended 93 merely to avoid the possible incidence of the heavy personal holding company tax upon G-D-C. And the remedy which the Government seeks is in effect to ignore Laurette's corporate entity by treating petitioner as having received the dividend which in fact was paid to Laurette. We think that, regardless of whatever other courses of action might have been open to the *294 Commissioner, he was not justified in treating this as a constructive dividend taxable to petitioner. *295 Laurette, first of all, cannot be disregarded as a sham entity. We think the evidence shows that Laurette was created to engage in some commercial activity, and more important it did in fact become a partner in the General Bearing Co. joint venture three months after its incorporation, and purchased G-D-C's interest in the Telserv joint venture some five months after that. True, Laurette did not operate a business as such, nor did it take part in the management of the joint ventures in which it had invested, but we have previously held that even the minimal activity of investing in a joint venture and receiving the profits therefrom may be sufficient to warrant recognition of a corporation as a separate taxable entity. Sam Siegel, 45 T.C. 566, 577. In Moline Properties, Inc. v. Commissioner, 319 U.S. 436, the Supreme Court said (p. 439): The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of *296 the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity * * *. (Footnotes omitted) See also National Investors Corporation v. Hoey, 144 F. 2d 466, 467-8 (C.A. 2); Ernest H. Weigman, 47 T.C. 596, 604-605; Sam Siegel, supra, 45 T.C. at 576; Aldon Homes, Inc., 33 T.C. 582, 597; John Junker Spencer, 19 T.C. 727, 736. Since Laurette in fact carried on bona fide business activities we think the Commissioner was not warranted in ignoring its existence as a sham and treating the dividends paid to it as having been constructively received by petitioner. We reach this result without giving any special weight to petitioner's contention that one of the reasons for organizing Laurette was to separate his commercial business ventures from the "hazardous" motion picture business supposedly carried on by G-D-C. That argument has a hollow ring, since there did not *297 appear to be any "hazardous" aspects to G-D-C's business in mid-1962 that called for any such segregation. But the commercial business activities committed to Laurette were in fact separate and distinct from whatever motion picture activities might be associated with G-D-C, and petitioner was fully justified in placing such commercial business ventures in a separate corporation. We hold that the corporate existence of Laurette may not be disregarded as a sham and that the dividends paid to it by G-D-C may not be attributed directly to petitioner for any such reason. [3] 94 Nor do we agree with the Government's alternative argument that petitioner is at least accountable for the $137,000 dividend declared by G-D-C on July 26, 1962, and actually paid to Laurette *298 on July 30, 1962. Its theory here is that petitioner, as stockholder of G-D-C, became entitled to that dividend at the time of its declaration on July 26, 1962, and could not shed his liability for tax in respect thereof by thereafter (on the same day) transferring his G-D-C stock to Laurette. The regulations upon which the Government relies in this connection provide as follows (Regs. sec. 1.61-9(c)): * * * When stock is sold after the declaration of a dividend and after the date as of which the seller becomes entitled to the dividend, the dividend ordinarily is income to the seller. When stock is sold between the time of declaration and the time of payment of the dividend, and the sale takes place at such time that the purchaser becomes entitled to the dividend, the dividend ordinarily is income to him. * * * (Emphasis added.) These Regulations make clear that for Federal income tax purposes, a taxpayer's right to a dividend "accrues" not when the dividend is declared, but when his right thereto *299 becomes fixed, or when he becomes "entitled" to receive the dividend from the corporation, regardless of his subsequent transfer of the stock itself prior to the date that the dividend is in fact paid. Cf. Putnam's Estate v. Commissioner, 324 U.S. 393. Ordinarily, dividends are declared to be payable to stockholders of record as of a given date, and, in general, the stockholders of record on that day are the ones "entitled" to receive the dividend. In the present case, however, there was no record date. The resolution of G-D-C's board of directors on July 26, 1962, contemplated that Laurette would become the owner of the G-D-C stock, and provided explicitly for the payment of the dividend directly to Laurette. Petitioner never became "entitled" to that dividend within the meaning of the regulations. It was specifically made payable to Laurette. This case is unlike Mark G. Anton, 34 T.C. 842, affirmed sub nom. Smith's Estate v. Commissioner, 292 F. 2d 478 (C.A. 3), where, on the special facts before the Court, the declaration of the dividend was thought to give the then stockholders a "vested right" in the dividend as of the date of its *300 declaration notwithstanding that it was payable to stockholders of record as of a later date. Here, the dividend was from the very outset payable directly and solely to Laurette; it was Laurette, rather than petitioner, that became "entitled" to it; and it is furthermore clear from the record that it was contemplated that Laurette would become the sole stockholder of G-D-C almost simultaneously with the declaration of the dividend. There is therefore absent here the underlying basis for applying the Government's alternative theory. 2. During the year 1962, petitioner donated to the University of Southern California at Los Angeles, California, a painting by the artist Georges Braque known as "Still Life", in which, however, he retained a life interest. The parties agree that this gift qualified as a charitable contribution subject to the statutory limitations of section 170, Internal Revenue Code of 1954, and also agree that the value of the gift, a remainder interest, will not exceed 64 percent of the fair market value of the painting as of the time of the gift in 1962. It is that fair market value which is in dispute, petitioner claiming a value of $85,000 *301 and respondent determining a value of no more than $60,000. The evidence discloses that the painting was produced by Braque in 1941 and was purchased by petitioner in 1947 for $3,700. Obviously, there had been a sharp increase in value by 1962. We heard testimony by petitioner's two expert witnesses, who were helpful in many respects. But we did not find their conclusions wholly satisfying. One used a "square inch" method of valuing the painting - a method that does not apear to be commonly accepted as a basis for determining fair market value of paintings generally or of the works of Braque in particular. The other expert, although plainly knowledgeable in the field of art, appeared to include an element of his own subjective or emotional reaction to the painting in arriving at fair market value. It was only after petitioner's counsel was repeatedly cautioned that a proper definition of fair market value be given to the witness as a basis for his opinion that such definition was given and an answer obtained from the witness. By that time, however, we had no confidence that the witness was in fact accommodating himself to the proper definition, and we had the definite impression *302 that he was merely undertaking 95 to respond with a valuation already formulated by taking into account unacceptable criteria. We also had before us evidence as to the prices paid for a large number of Braque paintings sold during the years 1960 through 1964. But all Braque paintings are not the same. As appears from the evidence, an oil is more valuable than a pastel, and a Braque painting executed around 1910 when Braque and Picasso were leaders of the cubist school is generally more valuable than a Braque painting of the 1920's, or, for that matter, of the 1940's. Also, the size of the painting is a factor of considerable importance, although, as indicated above, this element cannot be taken into account with mathematical precision based upon the number of square inches of canvas used. The matter is one calling for our best practical judgment on all the evidence, bearing in mind that the burden of proof is upon petitioner. And, upon the basis of all the evidence we conclude that the fair market value of the painting at the time of the gift in 1962 did not exceed $60,000. Decision will be entered under Rule 50. Footnotes
1. Petitioner was about 62 years of age at the time this contract was executed.↩
2. At that time, section 542(a) of the 1954 Code defined "personal holding company" to mean a corporation which satisfied certain conditions, one of which was that at least 80 percent of its gross income is "personal holding company income" as defined in section 543; and the latter section defined "personal holding company income" to include amounts received for personal services in circumstances that would include the amounts received for Cukor's services herein. However, since section 541 imposes the personal holding company tax only on "undistributed personal holding company income," which is defined, in general, as taxable income less Federal income taxes and minus dividends paid both during the taxable year and, at the taxpayer's election, dividends paid within two and one-half months following the close of that taxable year, a personal holding company can mitigate or completely avoid the impact of the tax by paying dividends. See secs. 545, 561, 562 and 563, I.R.C. 1954. See also the "deficiency dividend" procedure, sec. 547, I.R.C. 1954. In so doing, the corporation could avoid a second tax on its income which, in 1962, was at the rate of 75 percent of undistributed personal holding company income below $2,000, and 85 percent of such income in excess of $2,000. Section 542(a) was subsequently amended so that beginning after December 31, 1963, the foregoing 80 percent of gross income necessary to qualify a corporation as a "personal holding company" was changed to 60 percent of "adjusted ordinary gross income" as defined in section 543(b)(2). See section 225(b), Revenue Act of 1964, P.L. 88-272. G-D-C's return for its fiscal year ended July 31, 1962 reported income which in fact represented compensation for petitioner's personal services in an amount equal to about 78 percent of its total reported gross income. If there be included the additional 10 percent fee payable directly to Irving Paul Lazar (Cukor's agent) out of the compensation for Cukor's services, the 80 percent limit would have been exceeded. However, we express no opinion whether, in the circumstances of this case, G-D-C qualified as a personal holding company.↩
3. Although it may well be that there was no business purpose for the payment of the entire $141,000 in dividends to Laurette - it required less than $50,000 for the General Bearing venture and its need for cash in connection with the subsequent acquisition of G-D-C's interest in Telserv seems highly questionable -, the Government's remedy is plainly not to charge petitioner with having received a constructive dividend.↩