ALAN H. NITTLER and DOROTHY L. NITTLER, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Nittler v. Commissioner
Docket No. 112-74, 113-74, 8738-74, 8739-74, 466-77.
United States Tax Court
T.C. Memo 1979-440; 1979 Tax Ct. Memo LEXIS 86; 39 T.C.M. (CCH) 422; T.C.M. (RIA) 79440; November 1, 1979, Filed *86 Held, Lahai Roi Foundation is a separate taxable entity and was the beneficial owner of a ranch from December 5, 1968; held further, transfer of medical practice to Alan H. Nittler, M.D. Medical Office Trust was an assignment of income; held further, denial of tax-exempt status to Lahai Roi Foundation and Alan H. Nittler, M. D. Medical Office Trust sustained; heldfurther, horsebreeding activity not engaged in for profit; held further, business expense deductions determined; held further, sec. 6651(a)(1) and ( 2), I.R.C. 1954, penalties imposed on the Alan H. Nittler, M.D. Medical Office Trust sustained. Robert H. Weir and Sam Kornhauser, for the petitioners. Joyce Elaine Britt, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined the following deficiencies in petitioners' Federal income tax: Addition to Tax
Docket
Taxable
Sec. 6651
Sec. 6651
Petitioners
No.
Year
Deficiency
(a)(1) [2]
(a)(2)
Alan H. Nittler and
112-74
1967
$ 8,615.59
Dorothy L. Nittler
1968
20,536.00 *
1969
14,356.00 *
1970
17,198.00 *
Dorothy L. Nittler,
113-74
11/16/67-
Christina Allan Rustigan,
11/30/68
23,987.91
and Alan H. Nittler, Trustees
11/30/69
14,976.77
of the Alan H. Nittler, M.D.
11/30/70
18,977.74
Medical Office Trust
Dorothy L. Nittler,
8738-74
11/30/71
1,279.00
$288.00
$217.00
Christina Allan Rustigan,
and Alan H. Nittler, Trustees
of the Alan H. Nittler, M.D.
Medical Office Trust
Alan H. Nittler and
8739-74
1971
19,821.00 *
Dorothy L. Nittler
1972
30,664.00 *
Alan H. Nittler and
466-77
1973
42,554.00
Dorothy L. Nittler
1974
56,339.00
*87 There are six issues before this Court. [3]
1. Whether Lahai Roi Foundation, a California corporation, was a separate taxable entity from 1968 through 1974, and, if so, whether it or petitioners should be treated as the beneficial (owners) of ranch property. 2. Whether Alan H. Nittler's transfer of his medical practice to the Alan H. Nittler, M.D. Medical Office Trust was an assignment of income taxable to him as an individual. 3. Whether *88 Lahai Roi Foundation or the Alan H Nittler, M.D. Medical Office Trust qualify as a tax-exempt organization within section 501(c)(3) and, if so, whether petitioners or the Alan H. Nittler, M.D. Medical Office Trust are entitled to deductions under section 170 for contributions made to one or both organizations. 4. Whether Dorothy L. Nittler was engaged in the activity of horsebreeding for profit during the years at issue. 5. The amount of business expense deductions petitioners are entitled to for the taxable years at issue. 6. Whether section 6651(a)(1) and (2) penalties should be imposed on the Alan H. Nittler, M.D. Medical Office Trust. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Alan H. Nittler and Dorothy L. Nittler (hereinafter petitioners), husband and wife, resided in Aptos, California, when they filed their 1967 return with the District Director at San Francisco, California; their 1968, 1969, 1970 and 1971 returns with the Western Service Center at Ogden, Utah; their 1972, 1973 and 1974 returns with the Internal Revenue Service Center at Fresno, California; and when they filed their petitions in this case. Dorothy L. Nittler, *89 Christina Allan Rustigan, and Alan H. Nittler, Trustees of the Alan H. Nittler, M.D. Medical Office Trust (hereinafter Medical Office Trust), are petitioners on behalf of the trust. The Medical Office Trust had its principal office in Santa Cruz, California, when returns were filed on its behalf with the Western Service Center at Ogden, Utah, for its fiscal years 1968, 1969, 1970 and 1971 and when the petitions were filed in this case. Alan H. Nittler, M.D. (hereinafter Dr. Nittler), is a physician who practices nutritional medicine. On December 12, 1960, petitioners purchased approximately 76 acres of land in Aptos, California (hereinafter ranch), part of which was an apple orchard. Beginning in 1967, petitioners improved the ranch by building a ranch-style residence, a caretaker's house, barns, horse stalls and various other secondary structures. From 1960 through approximately 1967, petitioners had one full-time employee, Manuel A. Padilla, and hired three part-time employees at various times throughout this period to assist them in maintaining the ranch and in caring for the apple orchard. Facts Relating to Issues 1 Through 3
Early in 1967, Dr. Nittler contacted Edward Zimmel, *90 a San Jose life insurance salesman, about tax planning ideas. As part of Mr. Zimmel's tax planning, he contacted Estate Protection Service which drafted the instrument creating the Family Circle Trust. Petitioners executed the instrument on February 7, 1967, without consulting an attorney. The instrument creating the trust was revocable and designated Dorothy L. Nittler as trustor; Dr. Nittler, Dorothy L. Nittler, and Christina Allan Rustigan as trustees; and petitioners' three daughters as beneficiaries. Petitioners transferred their office building located at 113 Vine Street, Santa Cruz, California (hereinafter Vine Street property), and certain stocks and bonds to the Family Circle Trust. On Authst 29, 1967, petitioners amended the trust to make it irrevocable. Dorothy L. Nittler, as trustor, also surrendered any and all rights to alter, amend, or revoke the trust instrument except for appointing a successor trustee in the event of Dr. Nittler's death. Later in 1967, Dr. Nittler hired George Nicoladze for additional tax planning. Nicoladze was an employee of Crown Trust Foundation which was in the business of promoting foundations for the Christian Church. He directed an *91 attorney, retained by the Crown Trust Foundation, to draft an instrument creating the Alan H. Nittler, M.D. Medical Office Trust (Medical Office Trust). The trust was executed on November 15, 1967, and designated Dorothy L. Nittler, Christina Allan Rustigan, and Dr. Nittler as trustees. The Medical Office Trust was dedicated to the "welfare of humanity" and terminable by the unanimous vote of the trustees. Pursuant to the trust instrument, Dr. Nittler transferred his medical practice to the Medical Office Trust. The transfer was conditioned on the trust receiving tax-exempt status from the Internal Revenue Service. If tax-exempt status was denied, the trust would automatically terminate and all trust assets would revert to the grantor. The trust instrument further provided that the trust would engage the services of Dr. Nittler, pay him a fee to provide him with a subsistence level of living, and distribute the balance to foundations dedicated to nutritional research and medical services selected by the trustees. The Medical Office Trust rented office space, where Dr. Nittler could render his services, from the Family Circle Trust. On September 24, 1968, the Internal Revenue *92 Service denied the Medical Office Trust tax-exempt status. In furtherance of their tax planning, on March 6, 1968, petitioners executed and had notarized articles of incorporation for Lahai Roi Foundation (hereinafter "LRF"). Although adopted in March 1968, LRF's articles of incorporation were not filed with the State of California until April 25, 1969. LRF has remained a corporation in good standing under California law ever since that time. LRF's articles declare that it is dedicated to medical and scientific research and state the corporation's purposes and powers as follows: 1. To receive and administer any other property from any person and to hold, manage, administer and control any and all property hereafter acquired by purchase or otherwise; 2. To purchase, lease from others, and otherwise acquire, sell, convey, transfer, lease to others and otherwise dispose of, mortgage or otherwise encumber real or personal property; 3. To borrow or lean money * * *; and generally to transact and carry on any other business * * *. LRF's articles contain no provision for, or any reference to, an agency agreement with petitioners or anyone else. The Board of Directors of LRF held *93 its first meeting on March 26, 1968, at which time it adopted bylaws and elected officers. The officers elected were: Dr. Nittler, president; Dorothy L. Nittler, vice president; and Christina A. Rustigan, secretary. At thisd meeting, there was discussion of LRF purchasing petitioners' ranch and a resolution to purchase was passed. Dr. Nittler, as president, was authorized by the corporation to execute whatever documents were required to effectuate the transfer of the ranch to LRF. Petitioners and LRF entered into an executory contract of sale for the ranch on March 26, 1968. The contract of sale conditioned the transfer on LRF receiving tax-exempt status from the Internal Revenue Servcice and stated, in part, that if LRF: ultimately fails to achieve the status of an exempt organization qualified under the United States Internal Revenue Code Section 501(c)(3) and the California Revenue and Taxation Code Section 23701d, then this sale and the transfer of the property to the Buyer by the Seller is hereby declared null and void, and the property shall be retransferred by the Buyer to the Seller, and the Seller shall thereupon cancel all notes and the parties shall be deemed to have *94 not changed their position or ownership of assets from their status as of the date immediately preceding the date of this agreement. In the event that the sale under this agreement is voided ab initio as provided hereinabove, it is mutually agreed that the Seller shall have been the owner of the property at all times and all the transactions or business activities carried on by the Buyer shall have been carried on by the Buyer as the agent of the Seller, entirely on the Seller's behalf and without any proprietary interest in the Buyer. All expenses, taxes, capital improvements and contributions made by the Buyer shall be deemed to have been made by the Seller and executed by the Buyer as his agent. According to LRF's books, which were set up on March 1, 1968, petitioners transferred the ranch, consisting of approximately 33 acres at this time, to LRF on August 8, 1968. Petitioners, however, did not actually transfer the ranch by deed to LRF until December 5, 1968. The deed, recorded in the official records of Santa Cruz County on December 9, 1968, contained no conditions or restrictions on the transfer and did not refer to the contract of sale dated March 26, 1968, or any subsequent *95 agreement. In consideration for the ranch, LRF executed interest-bearing notes payable to petitioners. Petitioners reported the transfer of the ranch as a sale on their 1968 Federal income tax return. Santa Cruz County assessed real property taxes for the ranch on LRF from 1968 through 1974, the last taxable year at issue. Beginning in 1968, LRF engaged in numerous transactions with respect to the operation of the ranch and the purchase and sale of various properties. On September 24, 1968, LRF purchased the Vine Street property, the address of which had been changed to 913 Ceder Street (hereinafter the Vine/Cedar property), from the Family Circle Trust. The deed for the Vine/Ceder property was transferred to LRF in its name. On March 28, 1969, LRF by corporate resolution sold the Vine/Cedar property to a purchaser named Rittenhouse and authorized its president, Dr. Nittler, to handle the transaction. Rittenhouse executed an unsecured note to Dr. Nittler on March 27, 1969, one day before LRF authorized Dr. Nittler to sell the property. During 1969, its first full year of existence, LRF engaged in several other business transactions. On August 6, 1969, LRF purchased five lots *96 of Park Way Estates (hereinafter referred to as "Wanda Court") for approximately $79,309 on which it planned to build houses in order to realize a quick return of cash. Although LRF obtained construction loans totalling $62,500 for certain Wanda Court lots, the lots apparently were never improved, and from October 24, 1969 through July 3, 1970, LRF sold them to various unrelated their parties. LRF executed and recorded a deed for each of these lots and in none of the deeds was LRF designated as agent. LRF's gain from the sale of the Wanda Court lots was reflected in its books as well as on its Federal income tax return for the year ending March 31, 1970. On July 18, 1969, LRF entered a construction contract with Ed Hansmann Construction Company for an office building to be located at 1830 Commercial Way (hereinafter Commercial Way property). LRF obtained a construction loan and mortgage payable in the amount of $33,000 on the Commercial Way property. The gain from the sale of the Wanda Court lots enabled LRF to construct the office building which was later held for rental purposes. On May 8, 1970, the Internal Revenue Service denied LRF's application for tax-exempt status and *97 upheld its denial on September 30, 1970. The reason stated for the denial was: The operation of the ranch in the manner described is an accommodation to the business and other private interests of your founders Dr. and Mrs. A. H. Nittler, as opposed to any public interest that might be attributable to individual activities carried on at the ranch. You are not, therefore operated for any of the purposes specified in section 501(c)(3) of the Code. Petitioners then instructed their accountant, Al Lambert, to begin reporting LRF's income and expenses on their own income tax returns as of calendar year 1971. Shortly after LRF was denied tax-exempt status, George Nicoladze advised petitioners to reconvey the ranch to themselves and to retain LRF as a corporate shall. On March 16, 1971, LRF resolved to transfer "the operations of the orchard, livestock and poultry plus profits and expenses" to petitioners as of April 1, 1971, and to make "from that date interest on Mortgages Payable be their responsibility." Although LRF stopped filing Federal income tax returns for its taxable years following passage of this resolution, the resolution was never implemented. The ranch was never deeded *98 back to petitioners in 1971 or any subsequent year and the notes executed by LRF to petitioners in payment for the ranch were never canceled. Moreover, petitioners never consulted an attorney about the mechanics of transferring title to the ranch. From 1969 through 1974, LRF issued notes payable to petitioners for cash advances and contributions to capital. Although LRF filed Federal income tax returns only for its fiscal years 1968 through 1971, its general ledgers show rental income from its office buildings as follows: $4,000 in 1970, $5,720 in 1971, $10,315 in 1972. LRF also had bank accounts and motor vehicles registered in its name. Manuel A. Padilla, hired by petitioners in 1961, continued in the employ of LRF upon its incorporation. At various times LRF hired part-time employees. LRF filed Employer's Quarterly Federal Tax Returns through 1974 and issued W-2 forms to its employees. On June 9, 1977, LRF sold the ranch for $200,000. It executed the deed and received the sales proceeds. Title to the ranch had been insured by Western Title Insurance Company in LRF's name. The title insurance policy listed all the property interests of the ranch which LRF had held and conveyed. *99 Facts Relating to Issue 4
During the taxable years at issue Dorothy L. Nittler (here-inafter Mrs. Nittler) engaged in horsebreeding activities. By advertising in a number of magazines and publications she sold seven horses for an average price of $2,000 per horse. The expenses arising from the horsebreeding activities and other activities designated as "ranch" were not recorded separately. Facts Relating to Issue 5
In 1967, petitioners began converting the apple orchard on their ranch to an avocado orchard. Prior to the conversion, Dr. Nittler inquired about the feasibility of growing avocados in the Aptos area, the preferable variety of avocado tree to plant, and possible water problems he might encounter. While making his inquiry he learned that organic avocados sold for a substantially higher price than non-organic avocados. The higher selling price was due largely to the higher cost of producing organic avocados. Instead of sprays and herbicides, costlier methods of week control such as hoeing and composting are necessary. Moreover, natural fertilizers such as kelp, bloodmeal, and fishmeal must be used and are higher in price than fertilizers for non-organic production. In *100 July 1967, petitioners began planting approximately 700 avocado trees on six to seven acres of the ranch. Dr. Nittler did much of the manual labor himself with the help of Manuel A. Padilla. The avocado trees were mostly of the Bacon and Hass varieties which are suitable for the area, normally take seven years to reach maturity, and ripen at different times throughout the year.
After planting the avocado trees, petitioners had problems irrigating them. Dr. Nittler initially used a hose for watering each tree. He then installed an underground emitter system which was constantly having to be dug up for repair.The emitter system was replaced by an aboveground rainbird sprinking system which also proved unsatisfactory and was finally replacxed by a tap system. Moreover, petitioners had to drill several wells for irrigating the trees, one of which was drilled to a depth of 700 feet. In December 1972, the Aptos area was hit by the worst freeze in its history. The freeze destroyed 150 to 200 of petitioners' avocado trees. Another 100 to 150 trees were shocked, but subsequently grew back from their roots. The freeze resulted in the loss of two crops of avocados. Mrs. Nittler kept records *101 of cash receipts and disbursements for both LRF and the Nittler Family. She made journal entries in LRF's books of expenses she considered to be business-related after consulting with Dr. Nittler. Although she made allocations between personal and business expenses for property insurance premiums, gasoline, fertilizer, and utilities, Mrs. Nittler did not further distinguish the expenses related to the entire ranch from those related to the avocado orchard. The expenses shown on petitioners' tax returns were expenses related to the entire ranch excluding those expenses attributable to the house in which petitioners lived. Having made her allocation, Mrs. Nittler would instruct a girl in Dr. Nittler's medical office to post various expenses designated as either personal or business on blue ledger cards. From these blue ledger cards and from Mrs. Nittler's journal entries, petitioners' accountant prepared computer printouts of profit and loss statements for LRF. The accountant did not review the receipts which Mrs. Nittler classified as either personal or business. Moreover, he never audited the information given him for the preparation of petitioners' returns. Beginning with their *102 1971 Federal income tax return, petitioners reported the income and expenses recorded in LRF's books after March 31, 1971. When reporting the income and expenses classified as business on petitioners' returns for 1973 and 1974, the accountant merely transferred the income and expenses listed on LRF's books to petitioners' personal account. LRF's books and records disclose that expenses fell within three categories: (1) the expenses of the ranch; (2) the expenses in connection with renting the office buildings; (3) the expenses in connection with the sale of the Wanda Court properties. The expenses attributable to the ranch pertained to the following activities: (1) raising avocados; (2) maintaining farm animals; (3) maintaining a greenhouse; (4) maintaining the numerous buildings on the property; (5) maintaining the rest of the ranch not associated with the aforementioned activities or petitioners' residence. Over a seven-year period, petitioners deducted a total of $418,859.64 for expenses attributable to the maintenance and operation of properties held in LFR's name. OPINION Issue 1
On the question of whether LRF's a California corporation, was a separate taxable entity from *103 1968 through 1974, and, if so, whether it or petitioners should be treated as the beneficial (owners) of ranch property, respondent determined that the income and expenses of LFR should be attributed to petitioners because they in substance owned the ranch property and carried on the farming operation. [4] In their petition, petitioners alleged that such determination was erroneous. Respondent, agreeing with petitioners, amended his answer accordingly. In reply to respondent's amended answer, petitioners denied that LRF is a separate entity and claimed that the income and expenses of LRF are attributable to themselves. Petitioners' position is based on essentially three alternative arguments: (1) LRF was a mere sham created solely for the benefit of petitioners and should not be recognized for Federal tax purposes; (2) LRF never received good title to the ranch so the income and expenses of the farming operation are attributable to petitioners; and (3) even if LRF held good title to the ranch it was merely acting as petitioners' *104 agent with respect to the farming operation. Respondent maintains that the income and expenses of the farming operation are attributable to LRF because it is a California corporation in good standing and has held good title to the ranch since December 5, 1968. For reasons set out below, we find petitioners' position unpersuasive and hold for respondent. Petitioners argue that LRF was a mere sham corporation which should be disregarded for tax purposes because they were in conplete control of LRF's income and the farming operation on the ranch. We disagree.
Generally a corporation is respected as a separate entity for tax purposes. New Colonial Ice Co. v. Helvering,292 U.S. 435, 442 (1934); Weigman v. Commissioner,47 T.C. 596, 604 (1967), affd. 400 F. 2d 584 (9th Cir. 1968). The principal exceptions are when the corporation is a sham or when the corporation has been created for the purpose of tax avoidance. Britt v. United States,431 F. 2d 227, 233 (5th Cir. 1970); Strong v. Commissioner,66 T.C. 12, 22 (1976). In Moline Properties, Inc. v. Commissioner,319 U.S. 436 (1943), the Supreme Court established the rule for recognizing a corporation as a separate entity by stating: *105 The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity. 319 U.S. 438-439. [Footnote omitted.] We believe LRF had a business purpose and carried on business activity. The corporation was formed for the purpose of acquiring, selling, managing, and mortgaging properties. During the taxable years at issue, LRF's business activity included several transactions fulfilling its corporate purposes such as the buying and selling of the Wanda Court properties and the construction and rental of the Commercial Way office building. Although LRF's business activity was not extensive, it was sufficient for recognizing it as a separate entity. A determination of whether a corporation is doing business is not necessarily dependent on the quantum of business activity, such activity may be minimal. Britt v. United States,supra at 235, 237.Moreover, *106 LRF conducted too many corporate activites to be disregarded. See Weigman v. Commissioner,47 T.C. 596, 605 (1967). It maintained bank accounts, paid real estate taxes, entered contracts and had employees. In addition, it kept books and records, filed income tax returns, paid employees' salaries and filed their W-2 forms. Petitioners' argument that they were in complete control of LRF's income and the farming operation on the ranch is of no avail in their attempt to convince us that LRF should not be recognized as a separate taxable entity. A taxpayer's claim that his controlled corporation should be disregarded will be closely scrutinized. Strong v. Commissioner,supra at 24. The Supreme Court has held that shareholder domination, even to the extent that a corporation could be said to lack beneficial ownership of its assets and income, is insufficient to permit taxpayers to ignore the corporation's existence. National Carbide Corp. v. Commissioner,336 U.S. 422, 433-34 (1949); Moline Properties, Inc. v. Commissioner,supra.
Petitioners next argue that even if LRF is a separate entity for tax purposes, it never received good title to the ranch property. Under California law, *107 LRF did not come into existence until April 25, 1969, when its articles of incorporation were filed with California's Secretary of State.Hence, petitioners argue that the deed purportedly transferring title to the ranch to LRF on December 5, 1968, was ineffective because the requirements of delivery and acceptance were absent. The question of when a sale or exchange is complete -- or who owns property [5] -- for Federal income tax purposes is essentially a question of fact to be resolved by considering all the facts and circumstances. TennesseeNatural Gas Lines, Inc. v. Commissioner,71 T.C. 74, 83 (1978); Baird v. Commissioner,68 T.C. 115, 124 (1977); Deyoe v. Commissioner,66 T.C. 904, 910 (1976). The test is one of practicality. Clodfelter v. Commissioner,426 F. 2d 1391 (9th Cir. 1970), affg. 48 T.C. 694 (1967); Commissioner v. Segall,114 F. 2d 706 (6th Cir. 1940), revg. 38 B.T.A. 43 (1938), cert. denied 313 U.S. 562. Among the factors considered are the transfer of legal title and the shift of the benefits and burdens of ownership of the property. Merrill v. Commissioner,40 T.C. 66, 74 (1963), affd. per curiam, 336 F. 2d 771 (9th Cir. 1964). For purposes of real property, *108 the courts generally have placed special emphasis on the earlier of the transfer of legal title or the practical assumption of the benefits and burdens of ownership. Deyoe v. Commissioner,supra;Dettmers v. Commissioner,430 F. 2d 1019, 1023 (6th Cir. 1970), affg. Estate of Johnston v. Commissioner,51 T.C. 290 (1968).On the basis of this record, we conclude that the benefits and burdens of ownership passed to LRF on December 5, 1968.
The validity of a transaction under state law is not conclusive of its bona fides for purposes of Federal taxation. Commissioner v. Tower,327 U.S. 280 (1946), Gouldman v. Commissioner,165 F. 2d 686 (4th Cir. 1948). Although the refinements of conveyancing under California law were not complied with, LRF as an unincorporated association assumed the benefits and burdens of ownership after the transfer of title by deed occurred. LRF held title in its own name and executed interest-bearing notes payable to petitioners for the ranch. The transaction was not only reflected on LRF's books, but Santa Cruz County assessed LRF for the real property taxes on the ranch. LRF also insured title to the ranch in *109 its own name. Moreover, petitioners reported gain from the sale of the ranch on their 1968 Federal income tax return. Finally, in 1977, though subsequent to the taxable years at issue, LRF sold the ranch by executing a deed in its own name and received the proceeds from the sale. Petitioners' final argument is that even if LRF held title to the ranch it was merely doing so as their agent. In support of this position, they contend the March 26, 1968, contract of sale serves as a written agency agreement between LRF and themselves. We find petitioners' argument unconvincing because it is inconsistent with the facts. The deed by which petitioners transferred title to the ranch neither incorporated nor referred to the March 26, 1968, contract of sale between petitioners and LRF. There were no other corporate documents indicating that LRF was to act in the capacity of agent rather than beneficial owner of the ranch. When petitioners were notified that LRF was denied tax-exempt status, they passed a corporate resolution, which was never implemented, authorizing the reconveyance of the ranch to themselves. If, as conditioned in the March 26, 1968, contract of sale, LRF was acting as *110 petitioners' agent at the time it was denied tax-exempt status, the resolution to reconvey would have been unnecessary for petitioners to insure themselves the benefits of deductions arising from the expenses incurred for the farming operation. Petitioners simply did not treat LRF like an agent until after March 31, 1971, when they transferred the income and expenses from LRF's books to their own for income tax purposes. This case is not unlike Moline v. Commissioner,supra at 440, where the Supreme Court noted that "There was no actual contract of agency, nor the usual incidents of an agency relationship." Our inability to find an agency relationship is further supported by the reasons cited above for finding LRF as the beneficial owner of the ranch. Since LRF acted in its own name with respect to the ranch property, its ownership thereof will not be disregarded. See Strong v. Commissioner,66 T.C. 12, 24 (1976). LRF's business purpose was not simply that of carrying on the normal duties of an agent. National Carbide Corp. v. Commissioner,supra at 437. Petitioners adopted the corporate form for doing business. Choosing the advantages of incorporation to do business requires the *111 acceptance of the tax disadvantages as well. Moline v. Commissioner,supra;Higgins, v. Smith,308 U.S. 473, 477 (1940). In sum, petitioners are not entitled to the deductions for the expenses from the farming operations on the ranch after December 5, 1968, because from that time LRF was the beneficial owner of the ranch and incurred the expenses as a separate taxable entity. We have considered petitioners' other arguments and find them unpersuasive. Issue 2
Upon creating the Medical Office Trust, Dr. Nittler transferred his medical practice to the trust. Respondent maintains the transfer was an assignment of income. He argues that since Dr. Nittler transferred the mere right to collect the income he earned from his medical practice rather than income-producing property, such income is taxable to him. Petitioners contend that Dr. Nittler transferred his business to the trust. They argue that just because the income reported by the trust was earned by the rendering of Dr. Nittler's services is not sufficient reason to tax him on such income. We disagree and hold for respondent.
Section 61(a)(1) defines gross income, in part, as income from whatever source derived including compensation *112 for services. The principle that income must be taxed to him who earns it was firmly established in Lucas v. Earl,281 U.S. 111 (1930). Whether the ultimate recipient of diverted income is an individual or, as in this case, an entity such as a trust is immaterial. United States v. Basye,410 U.S. 441, 449 (1973). An inquiry as to whether there has been an assignment of income involves determining who in fact controls the earning of such income. American Savings Bank v. Commissioner,56 T.C. 828, 839 (1971).
The Medical Office Trust instrument provided that upon transfer of his medical practice to the trust, Dr. Nittler was to be employed by the trust to practice medicine. Despite the transfer and employment arrangement, however, we believe Dr. Nittler, not the trust, had ultimate control over earning income from the medical practice. The trust did not operate Dr. Nittler's medical practice, he did, in that the rendering of medical services was under his sole control. The amount of income the trust reported depended on whether Dr. Nittler rendered medical services which bore no relationship to the fee providing him with a subsistence level of living. He exerted the effort to earn *113 the income and merely made an anticipatory assignment of his right to collect such income. Hence, the trust had little more than the power to collect the income after it had been earned by Dr. Nittler. Respondent also maintains, in the alternative, that since the trust violates nearly every provision of Subchapter J, the income reported by the trust should have been reported by Dr. Nittler.We find it unnecessary to address those arguments because the record shows that the trust corpus was comprised of income only from Dr. Nittler's medical practice which we have already attributed to him. Therefore, all the income derived from the medical practice should have been reported by Dr. Nittler himself. Issue 3
As to whether LRF or the Medical Office Trust qualify as a tax-exempt organization within section 501(c)(3) and, if so, whether petitioners or the Medical Office Trust are entitled to deductions under section 170 for contributions made to one or both organizations, petitioners maintain that respondent should not have denied either organization tax-exempt status under section 501(c)(3). [6] Respondent's reasons for denying tax-exempt status to LRF and the Medical Office Trust were *114 that both organizations served the business and private interests of petitioners rather than any public interest purposes specified in section 501(c)(3). In view of the record in this case we must hold for respondent, and petitioners' argument warrants only a brief comment. Petitioners argue that respondent's *115 denial of tax-exempt status to LRF, because LRF was operating the ranch for their business and private interests, is inconsistent with respondent's claim that LRF should be recognized as a separate entity. We disagree. The purpose of most closely held corporations is to serve the private interests of their incorporators. Although this is sufficient reason to deny a corporation tax-exempt status, it is certainly no reason for refusing to recognize a corporation as an entity separate from its incorporators. National Carbide Corp. v. Commissioner,supra;Moline Properties, Inc. v. Commissioner,supra.Creating a corporation is merely exercising the choice of the form in which a taxpayer wants to do business. Despite the state purposes for creating LRF and the Medical Office Trust in their respective instruments, the facts do not support a finding that either organization was organized for educational and research purposes and petitioners have failed to present any evidence showing otherwise. Thus, respondent's denial must be sustained and neither petitioners nor the Medical Office Trust are entitled to charitable contribution deductions provided by section 170 for amounts they advanced *116 to either organization. These amounts must be treated as contributions to the capital of LRF or transfers to the corpus of the Medical Office Trust. Issue 4
On the issue of whether Mrs. Nittler was engaged in the activity of horsebreeding for profit during the years at issue, petitioners contend that she was so engaged and is entitled to deduct losses sustained from such activity in excess of gross income earned from such activity. Respondent maintains that Mrs. Nittler's horsebreeding activity was merely a hobby and that petitioners have failed to carry their burden of proving that she was engaged in it for profit. We agree and hold for respondent.
Section 162(a) allows a taxpayer to deduct all ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business. The test for determining whether a taxpayer is carrying on a trade or business under section 162 is whether he engaged in the activity with the primary purpose and intention of making a profit. Allen v. Commissioner,72 T.C. 28, 33 (1979); Dunn v. Commissioner,70 T.C. 715, 720 (1978). Beginning in 1970, section 183 is applicable for determining whether an activity was not engaged *117 in for profit. Section 183(a) provides the general rule that if a taxpayer engaged in an activity, and "if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section." Section 183(b)(1) provides that deductions which would be allowable without regard to whether such activity is engaged in for profit shall be allowed. Section 183(b)(2) provides that deductions which would be allowable only if such activity is engaged in for profit shall be allowed "but only to the extent that gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1)." Section 183(c) defines an activity not engaged in for profit as follows: (c) Activity Not Engaged in for Profit Defined.--For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212.
The test for determining profit motive before and after the enactment of section 183 is whether a taxpayer entered into or conducted *118 an activity with the good faith expectation of making a profit, regardless of whether that expectation was reasonable. Mercer v. Commissioner,376 F. 2d 708, 710-711 (9th Cir. 1967); Dunn v. Commissioner,supra;Bessenyey v. Commissioner,45 T.C. 261, 273-274 (1965), affd, 379 F. 2d 252 (2d Cir. 1967), cert. denied 389 U.S. 931 (1967). Section 1.183-2(b), Income Tax Regs., sets forth some of the relevant factors, generally distilled from prior case law, which are to be considered in determining whether a taxpayer had a bona fide expectation of making a profit.[7] *119 This expectation, however, is not to be resolved on the basis of any one factor but on the basis of all the facts and circumstances. Sec. 1.183-2(b), Income Tax Regs.; Allen v. Commissioner,supra.
The only evidence in the record is Mrs. Nittler's testimony that she raised horses for profit, not for fun, and that she advertised her horses for sale in magazines and horse-related publications. She also testified that she sold seven horses for an average price of $2,000 per horse.This is insufficient evidence to persuade us that she was engaged in horsebreeding with a bona fide expectation of making a profit. Furthermore, Mrs. Nittler, as keeper of the books for LRF and her family, failed to maintain separate books and records for an activity she contends was a separate business. No evidence was presented showing when horses were purchased and sold or the timing and amount of expenditures for feed and other items needed for the horsebreeding activity. The expenditures were merely lumped with other ranch expenses which we have largely attributed to LRF. Petitioners simply have not carried their burden of proving that Mrs. Nittler's horsebreeding activities were profitmotivated. [8]Welch v. Helvering,290 U.S. 111 (1933); *120 Rule 142(a), Tax Court Rules of Practice and Procedure.
Issue 5
We must next determine the amount of business expense deductions petitioners are entitled to for the taxable years at issue. Petitioners claimed business expense deductions of $418,859.64 for the farming operation on the ranch over the seven-year period at issue. Respondent claims that such amount was excessive because some of the deductions are attributable to LRF and petitioners failed to properly allocate deductible business expenses from nondeductible personal expenses. On the basis of the entire record and of our finding LRF a separate taxable entity, we agree. Deductions are a matter of legislative grace, New Colonial Inc. Co. v. Helvering,292 U.S. 435 (1934), and petitioners bear the burden of proving they are entitled to claimed deductions as well as the correctness of the claimed amounts. Welch v. Helvering,290 U.S. 111 (1933), Rule 142, Tax Court Rules of Practice and Procedure. *121 An expense must bear a proximate relationship to the conduct of a business in order to be deductible as an ordinary and necessary business expense under section 162. Having found that LRF, as beneficial owner of the ranch after December 5, 1968, is entitled to the deductions arising from the farming operation on the ranch after that time, we must determine whether petitioners are entitled to any deductions arising from the farming operation on the ranch prior to December 5, 1968. The farming operation on the ranch was comprised of several activities such as growing avocados, horsebreeding, raising other farm animals, and maintaining a greenhouse. In his brief respondent conceded that the growing of avocados was an activity engaged in for profit. Having found that the horsebreeding activity was not engaged in for profit, expenses arising from such activity must be treated as nondeductible personal expenses to the extent they exceed gross income from such activity.Since petitioners did not attempt to prove that any of the other ranch activities were profit-motivated, our determination as to the amount of their allowable business expense deductions pertains solely to those arising *122 from the avocado growing activity. Claiming petitioners failed to prove that they properly allocated their expenditures as either deductible business or nondeductible personal expenses, Wiles v. United States,312 F. 2d 574, 577 (10th Cir. 1962), respondent urges us to deny them any business expense deductions arising from their avocado growing activity. Petitioners' bookkeeping methods and allocations were imprecise, but to allow no deductions when we know business expenses were incurred is too harsh a result. On the basis of the record, we must make a careful approximation under the rule of Cohan v. Commissioner,39 F. 2d 540 (2d Cir. 1930), bearing heavily on petitioners whose inexactitude is of their own making.
Petitioners, as well as two experts, testified and introduced documentary evidence to show the cost of developing an avocado orchard. Petitioners' expert, Wilbur Britt, owned a 40-acre ranch on which he planted 150 avocado trees per acre. He testified that, although he was not certain about the exact cost of developing and maintaining his avocado orchard, he knew that his bank account went down $3,000 to $4,000 per month. He also pointed out, however, that this amount *123 included expenses incurred for his nursery business and that the total of such expenses was offset by profit. On the basis of Britt's testimony that it costs from $36,000 to $48,000 per year to develop and maintain a 40-acre orchard consisting of 6,000 trees, respondent contends that a 6-acre orchard consisting of 700 trees would cost between $5,400 and $7,200 per year to operate. Respondent's expert, Ronald H. Tyler, is a farm adviser with the University of California in Santa Cruz County and author of a report entitled "avocado Growing in Santa Cruz County." He was a credible witness and testified to verify a conclusion in his report that the "total costs for orchard development varies from $3,000 to $6,000 per acre over a five-year period excluding cost of land and irrigation facilities." The cost estimates in his report, however, are defective as applied to this case. They were based on the San Diego area in 1967 and the Santa Barbara area in 1970 because no cost estimates were made for Santa Cruz County where petitioners' orchard was located. The estimates in his report also did not take into account the higher costs of raising organic avocados due to using special fertilizers *124 and cultivation methods. In Mr. Tyler's opinion, petitioners' expenses would have been approximately $1,500 per acre the first year of development and $400 to $500 per acre for years following. On the basis of these experts' testimony, the documentary evidence submitted by both petitioners and respondent, and the entire record, we have determined under the Cohan rule that the expenses relating to the development of petitioners' 6-7 acre avocado orchard during the first year, 1967, were $15,000 excluding property taxes. The expenses incurred during 1968 were $5,000, excluding property taxes. We find it unnecessary to determine the business expenses for subsequent years because they are attributable to LRF which is not a party to this case. Since the ranch was conveyed to LRF on December 5, 1968, the business expenses we have determined for 1968 must be allocated between petitioners and LRF in the computation under Rule 155, Tax Court Rules of Practice and Procedure.
Issue 6
Finally, we must decide whether section 6651(a)(1) and (2) penalties should be imposed on the Alan H. Nittler, M.D. Medical Office Trust. In his notice of deficiency respondent imposed the penalties provided *125 by section 6651(a)(1) for failure to file a timely return and section 6651(a)(2) for failing to pay taxes in a timely manner on the Medical Office Trust. Determinations made by respondent in his notice of deficiency are presumed correct. The burden is on petitioners to show that those determinations are wrong. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. Since petitioners, as trustees, presented no evidence with respect to this issue, they have failed to carry their burden, and, therefore, the imposition of the penalties must be sustained. [9]
To reflect the foregoing, Decisions will be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: Dorothy L. Nittler, Christina Allan Rustigan, and Alan H. Nittler, Trustees of the Alan H. Nittler, M.D. Medical Office Trust, docket No. 113-74; Dorothy L. Nittler, Christina Allan Rustigan, and Alan H. Nittler, Trustees of the Alan H. Nittler, M.D. Medical Office Trust, docket No. 8738-74; Alan H. Nittler and Dorothy L Nittler, docket No. 8739-74; and Alan H. Nittler and Dorothy L. Nittler, docket No. 466-77.↩
2. Statutory references are to the Internal Revenue Code of 1954, as amended.↩
*. By amending his answer, respondent increased the dificiency he originally asserted by statutory notice. ↩
3. Petitioners have aoparently conceded other issues raised in respondent's notice of deficiency. Most notable is that concerning the Family Circle Trust. Respondent determined that the income and expenses reported by the Family Circle Trust should have been reported by petitioners. Since petitioners presented no evidence with respect to that issue, they have failed to carry their burden of proving respondent's determination wrong. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.↩ Therefore, we must hold for respondent.
4. Respondent also determined that the farming operations were not engaged in for profit but later conceded that the avocado production was a profit-making activity.↩
5. See Cashion v. Commissioner,T.C. Memo. 1978-466↩.
6. Section 501(c)(3) provides, in part, as follows: SEC. 501. Exemption From Tax On Corporations, Certain Trusts, Etc. * * *
(c) List of Exempt Organizations.--The following organizations are referred to in subsection (a): * * *
(3) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office.↩
7. Such factors include: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial statute of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved.
8. We recognize that petitioners have cited and relied upon Farris v. Commissioner,T.C. Memo. 1972-165↩, which we have considered and find distinguishable in that the record in that case was more extensive and persuasive in support of the taxpayer's position.
9. In view of our finding an assignment of income with respect to Issue 2, we are aware that this issue may be moot in that there may no longer be a deficiency on the part of the Medical Office Trust upon which the penalties may be imposed. This must be taken into consideration in the Rule 155↩ computation.