T.C. Memo. 2000-179

UNITED STATES TAX COURT

JAMES P. SHEA AND PATRICIA H. SHEA, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

CHRISTOPHER M. AND KIM A. SHEA, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 2860-96, 2861-96.          Filed May 30, 2000.

<u>Joseph Falcone</u>, for petitioners.

<u>Timothy S. Murphy</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GALE, <u>Judge</u>:  Respondent determined deficiencies in
petitioners' Federal income taxes and penalties as follows:

James P. Shea and Patricia H. Shea, docket No. 2860-96

| Year | Deficiency | Penalty Sec. 6662[1] |
|------|-----------|----------------------|
| 1992 | $244,224 | $48,485 |

Christopher M. and Kim A. Shea, docket No. 2861-96

| Year | Deficiency | Penalty Sec. 6662 |
|------|-----------|-------------------|
| 1992 | $47,945 | $9,589 |

Because these cases present common questions of fact and law, they were consolidated for purposes of trial, briefing, and opinion and hereinafter will be referred to in the singular.

The issues for decision are as follows:

(1) Whether certain expenditures deducted by petitioners on Schedules C of their 1992 Federal income tax returns were incurred in a trade or business within the meaning of section 162;

(2) alternatively, whether petitioners are entitled to deduct all or any part of the losses claimed--

(a) as theft losses arising from a transaction entered into for profit under section 165(c)(2),

(b) as theft losses under section 165(c)(3),

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. For convenience, all monetary amounts are rounded to the nearest dollar.

(c) as capital losses under section 165(f), or

(d) as business bad debts within the meaning of section 166;[2] and

(3)   whether petitioners are liable for accuracy-related penalties authorized by section 6662?

FINDINGS OF FACT

Background

Some of the facts have been stipulated and are so found.  We incorporate by this reference the stipulation of facts and attached exhibits.

Petitioners James P. Shea and Patricia H. Shea were married and filed a joint Federal income tax return for the taxable year 1992.[3]  At the time their petition was filed, petitioner James P. Shea resided in Troy, Michigan, and petitioner Patricia H. Shea resided in Ludington, Michigan.

Petitioners Christopher M. Shea and Kim A. Shea were married and filed a joint Federal income tax return for the taxable year

---

[2] In their petitions, petitioners asserted an additional ground for deducting the losses claimed, contending that the losses qualified as small business losses under sec. 1244. However, petitioners did not include the sec. 1244 issue in either their trial memorandum or their posttrial briefs and presented no evidence at trial in support of their position. Consequently, the petitioners are deemed to have abandoned the sec. 1244 issue.  See Bernstein v. Commissioner, 22 T.C. 1146, 1152 (1954), affd. per curiam 230 F.2d 603 (2d Cir. 1956).

[3] James P. Shea and Patricia H. Shea subsequently divorced.

1992.  At the time their petition was filed, petitioners Christopher M. Shea and Kim A. Shea resided in Rochester, Michigan.

Petitioners James P. Shea (James) and Christopher M. Shea (Christopher) are brothers who, during 1992, worked at a company called PK Contracting.  PK Contracting (the company) was in the business of painting lines on roads.  James, a vice president of the company, has worked for the company for more than 20 years and is a part owner of the company.  As of the trial date, Christopher was the president of the company and ran the company's day-to-day operations.  In 1992, Christopher was the general manager, with similar operational responsibility.[4]

None of the petitioners were in the trade or business of lending money.

The Russian Airplane Deal

Sometime prior to January 19, 1992, James was introduced to Michael Donnelly by a friend.  Donnelly, who claimed to be a retired U.S. Army major general, described a plan in which he and some others would buy Russian airplanes (Ilyushin-72s) for substantially less than their purported fair market value and resell them in the West for $5 to $8 million per airplane or use

_____

[4] Petitioners Patricia H. Shea and Kim A. Shea are involved in these consolidated cases only because they filed joint Federal income tax returns with their husbands for 1992.

them in an overnight air freight and mail business serving Eastern and Central Europe and the Commonwealth of Independent States (the plan).  Others allegedly involved in the plan included E. B. Leedy, who claimed to be a retired U.S. Army major general, and Brian Wilcox, a principal in a company called Wilcox Engineering with offices in Great Britain, who was described in promotional materials as the owner of a large joint venture timber operation in Russia (the promoters).  The plan, which was supposed to turn a quick and substantial profit, intrigued James.

Sometime prior to January 19, 1992, James went to England and met with the promoters of the plan.  Either prior to or during his trip, James agreed to provide the initial financing for the plan and subsequently did so, transferring $650,000[5] by cable transfer to a bank account of Quotum International Trading, Inc. (Quotum) at Nordbanken on or about January 22, 1992.

In consideration for the transfer of funds, James received the following:

---

[5] The total amount provided by James is unclear.  The amounts allegedly provided varied from $611,750, the amount reflected in a promissory note, to $900,000, a figure that appeared in at least one document admitted solely to establish James' "state of mind".  On cross-examination, James was unable to reconcile or explain the conflicting amounts.  He was also unable to explain how he handled Christopher's investment of $150,000, which was made by check dated January 30, 1992, after the initial cable transfer of $650,000 was made.

(1)  A promissory note dated January 19, 1992, in the principal amount of $611,750 which was executed in favor of James, ostensibly by Brian Wilcox and Michael Donnelly; and

(2)  stock certificate No. 1, dated January 19, 1992, representing 125 shares of stock in Quotum which was issued to Candid, Inc. (Candid), an S corporation in which James was a shareholder.[6]

The note was unsecured, bore no interest, and required payment in full "upon demand" on February 20, 1992.

James understood that the money he had transferred to Quotum would be used to purchase Russian airplanes, that the money would not be withdrawn from the bank account without his express authorization, and that he would own a specified percentage of Quotum's stock[7] and serve as Quotum's president in consideration for initially financing Quotum's operations.

----

[6] Conflicting testimony was given concerning James' stock ownership in Candid, Inc.  James testified that he was the sole shareholder of Candid.  James' accountant, Jeffrey J. Groen, testified that James was the majority shareholder and that several professors owned stock in Candid as well.

[7] In a letter dated April 1, 1992, to Michael Donnelly, James stated that he was supposed to receive a 25-percent ownership interest in Quotum and refers to a $700,000 investment. At trial, however, James testified that he was supposed to receive a 51-percent ownership interest.

At some point during his review of the plan, James acquired additional documents regarding the plan participants and how they proposed to operate. These documents showed the following:

(1) The promoters intended to do business through Quotum, a Liberian corporation that was formed on August 1, 1991;

(2) on November 8, 1991, a first meeting of incorporators and subscribers was held at the offices of Wilcox Engineering Ltd. located in Hereford, U.K. At the first meeting, a "Transfer Subscription of the Capital Stock of the Corporation" for one share of "Bearer" stock was approved, Brian Wilcox was elected board chairman, and he and Michael Donnelly were elected directors;

(3) at a meeting of the board of directors of Quotum held on January 19, 1992 at Wilcox Engineering, Brian Wilcox was elected president and board chairman, Michael Donnelly was elected vice president, and Ian Yemm was elected secretary/treasurer;

(4) at another meeting of the board of directors of Quotum held later in the day on January 19, 1992, James was elected president, E. B. Leedy was elected chairman of the board, Ian Yemm was elected secretary/treasurer, and Michael Donnelly, Brian Wilcox, Bjourn Andersson, and Mladen Kovatchev were elected directors. A resolution giving James the right, in his sole discretion, to disburse the "initial funding of $611,750" and to

be repaid immediately "as soon as the lease back funds has been released to the corporation" was unanimously approved;[8] and

(5) Quotum planned to acquire the Russian airplanes through a Swedish company called Truemax. By contract with Truemax dated January 21, 1992, Quotum agreed to acquire "four units IL76 aircraft FOB Western Hemisphere Airport" and to deposit $360,000 "in blocked funds to [an] account on Nordbanken as guarantee and handling fee." James signed the contract as Quotum's president.

Although James received repeated assurances that delivery of the airplanes was imminent, the airplanes were not delivered as promised in January 1992. In early February 1992, James was advised that cash had to be delivered to the seller in Russia. In order to facilitate delivery, James agreed to permit the withdrawal of $280,000 from the Nordbanken account so that the funds could be carried into Russia.

In addition to the above, James was advised and understood that Quotum had deposited $250,000 toward the cost of insurance with respect to the airplanes. The insurance was to be placed

---

[8] The planned business activity seemed to change on a regular basis. One of the proposals was to acquire Russian airplanes, immediately sell them at a substantial profit, and lease them back for use in an air freight and mail service business. Other business activities mentioned were the purchase and sale of diamonds, gold, and a limited amount of sable, the purchase of materials from military stores using an existing offshore company named "Cougar", and the transport of relief goods and food. The record suggests that more than one company was involved.

through an insurance broker, M. B. Quin-Harkin of Houlder

Insurance Services (Aviation) Limited.

By the end of February 1992, the airplanes still had not

been delivered to Quotum.  In a letter dated February 28, 1992,

James' secretary wrote to Ian Yemm requesting, among other

things, "a complete accounting to date of * * * [James'] original

$650,000 investment."  By telefax dated March 4, 1992, Yemm

provided the following accounting:

```
      Deposited                   $650,000.00
      Less:
       Bank charges                      69.71
       Houlder insurance          250,000.00
       Truemax Sweden              72,000.00
       Michael E. Donnelly
         airplane deposit         281,000.00

      Balance                     $ 46,930.29
```

James continued to send and receive various correspondence

regarding the status of the venture throughout March and April

1992.  By letter dated April 1, 1992, on Quotum stationery, James

replied to a communication from Michael Donnelly as follows:

> Surprised, but glad, to hear from you.  $100,000
> is a lot of money to waste.  $700,000 is a fortune.
> The $700,000 from me was for a three day guaranteed
> purchase of existing planes per your representation and
> a 25% ownership in the company purchasing the planes.
> Legally, this money was not to fund your personal
> schemes.  * * *  None of my money was ever to be at
> risk and for a two year period every, repeat, every
> transaction was to be approved by me.  Can I go to the
> bank and get my funds?
>
> I want the written proof from Lloyds that the
> $250,000 deposit is refundable.  I also want a

guarantee and statement from them assuring me that it can only be exposed or converted at my written approval. If this is not possible, have funds returned to me immediately. Remember, I was supposed to be the president of the company.

By telefax dated April 14, 1992, from Brian Wilcox, James was informed of the following:

As you are aware Jim, the whole operation was based on the ability of the Swedish Group who consistently told us that they had in their control a number of IL 76 aircraft. The money you were so kind as to invest in Quotum International was, as I understood it, to secure these planes once and for all through the Swedish Group.

After a number of weeks with Mike out of circulation in Russia it became apparent that Jens and his partners had as much control over the IL 76 planes as Tom and Jerry have over the world economy. Unfortunately a great deal of money was spent chasing non existent aircraft.

I would like to remind you that we do indeed have a contract between the Swedish Group and Quotum International and as far as I can see, they have not contributed in any way to the current planes for which we are negotiating. I think a serious discussion will need to take place in due course. I do not like to see people's money being thrown away and as you know Jim it has been extremely difficult for us to hold a deal together with no financial resources.

The status on your funds is as follows:

USD250,00[0] was put on insurance and was energised on the 4th January after we received two serial numbers from Jens. At this time the Swedish group said that they were in possession of two IL 76 aircraft and that we would have to insure them to fly them out of Russia into Sweden. It also meant that we could move forward with the re-finance funding.

We expect Michael to come out of Russia this weekend and should then be able to get an up date on these funds.

We believe that the prospects are still favourable and have every confidence in our part of the operation even though we are working with only half truths.

At some point during 1992, James was repaid $42,000 out of the funds that he had transferred to Quotum. James asked Brian Wilcox to take steps to obtain a refund of the $250,000 insurance deposit paid by Quotum. He also attempted to obtain information regarding the deposit himself, but the insurance company refused to provide any information.

By letter dated August 14, 1992, Thomas Ziegler, James' lawyer, wrote to Sarah L. Argyle, a British barrister, setting forth some of the background information regarding James' claim for return of his funds. Although Ms. Argyle wrote back, outlining her fee arrangements and enclosing a list of questions, the record does not indicate whether any legal action was taken to recover additional amounts from Brian Wilcox, Wilcox Engineering, or Houlder Insurance Services (Aviation) Limited.

On September 4, 1992, Donnelly filed a chapter 7 bankruptcy petition which listed an unsecured claim by James in the amount of $650,000. On December 10, 1993, the bankruptcy proceeding was closed.

Christopher's Investment in the Russian Airplane Deal

The funds transferred on or about January 22, 1992, to
Nordbanken by James for the benefit of Quotum can be traced, in
part, to $500,000 contributed by James after he cashed
certificates of deposit held by the James P. Shea Living Trust.
The source of the additional $150,000 transferred to Nordbanken
does not appear in the record.  On a date which also does not
appear in the record, Christopher gave James a check dated
January 30, 1992, for $150,000.[9]  Christopher gave the money to
James because James "had an opportunity to do some overseas
business that could possibly be profitable" and Christopher
wanted to invest in it.  Christopher did not know much about the
venture or how his investment was to be used, but he understood
that, if the venture was successful and he was needed, he could
get involved in the day-to-day operations.  The record does not
show what James did with Christopher's $150,000.

Petitioners' 1992 Returns and the Notices of Deficiency

Petitioners James and Patricia Shea filed a joint Federal
income tax return for 1992.  On a Schedule C to that return,
James reported no gross income and a net operating loss of

---

[9] Christopher's check was dated 8 days after James
transferred the initial $650,000 to Quotum's account at
Nordbanken.

$743,561 from a business described as "international

transportation - aircraft" composed of the following:

| | |
|---|---:|
| Advertising | $106 |
| Legal and professional service | 11,662 |
| Office expense | 112 |
| Travel | 80,883 |
| Meals and entertainment (less 20 percent) | 436 |
| Other direct cost of sales | 650,000 |
| Investment research | 320 |
| Misc. | 27 |
| Bank charges | 15 |
| | |
| Net loss | $743,561 |

Petitioners Christopher and Kim Shea also filed a joint

Federal income tax return for 1992.  On a Schedule C to that

return, Christopher reported negative gross income of $150,000

from a business described as "international transportation",

consisting solely of cost of goods sold in that amount.

In notices of deficiency, respondent determined that

petitioners had not shown that their Schedule C activity was a

trade or business and disallowed their respective losses.

Petitioners filed timely petitions contesting respondent's

determination and alleging, in the alternative, that the Schedule

C losses were deductible under section 165, 166, or 1244.

### OPINION

Petitioners contend that they are entitled to deduct the

losses claimed on their respective Schedules C because they were

engaged in the trade or business of "international

transportation".  Alternatively, petitioners contend that the amounts claimed on their Schedules C qualify as either a theft loss under section 165(c)(2) or (3), a business bad debt under section 166, or, at a minimum, a capital loss under section 165(f).  Respondent rejects the proposition that petitioners were actively engaged in a trade or business reportable on Schedule C with respect to buying and selling Russian airplanes in 1992, claiming instead that the business activity was conducted by a corporation, Quotum, and that James participated in that activity as Quotum's president.  Respondent also contests the alternative grounds for deducting the amounts at issue, arguing that petitioners have failed to satisfy their burden of proof.  We consider each of petitioners' arguments below.

Did Petitioners Incur Deductible Losses in a Trade or Business?

As a general rule, ordinary and necessary expenses paid or incurred during a taxable year in carrying on a trade or business are deductible.  See sec. 162(a).  A taxpayer is engaged in a trade or business if the taxpayer is involved in the activity (1) with continuity and regularity, and (2) with the primary purpose of making income or a profit.  See Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987).  Petitioners have the burden of proving that they were involved in a trade or business with respect to the purchase and sale of Russian airplanes.  See Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933).

In this case, even if the activities in which James was involved qualified as a trade or business,[10] the trade or business was not his. The trade or business was that of Quotum, a corporation of which James was the president. The record in this case, while extremely sparse, contradictory, and confusing, demonstrates that James' attempts to facilitate the purchase and delivery of Russian airplanes were on behalf of Quotum. He corresponded using Quotum's stationery. He executed documents in his capacity as Quotum's president. Although he incurred travel expenses during 1992, the expenses were incurred in connection with Quotum's business, and James requested reimbursement for those expenses from Quotum.

A corporation may not be disregarded for tax purposes if the corporation has a substantial business purpose or it actually engages in business. See Moline Properties, Inc. v. Commissioner, 319 U.S. 436, 438-439 (1943); Jackson v. Commissioner, 233 F.2d 289, 290 (2d Cir. 1956). In this case, Quotum had a substantial business purpose--the purchase, sale,

---

[10] Whether the alleged trade or business had actually commenced is debatable. Ordinarily, expenses paid after a decision has been made to start a business but before the business commences are not deductible. Such preopening expenses are capital in nature. See sec. 195; Madison Gas & Elec. Co. v. Commissioner, 72 T.C. 521 (1979), affd. 633 F.2d 512 (7th Cir. 1980); Frank v. Commissioner, 20 T.C. 511 (1953).

and use of Russian airplanes.  In addition, no party has contended that Quotum's corporate existence must be disregarded.

Although we have found that James transferred substantial funds to or on behalf of Quotum and paid some corporate expenses personally, the fact that James supplied funds to pay Quotum's expenses and finance its operations does not make his investment or the expenses that he paid deductible by him.  See Whipple v. Commissioner, 373 U.S. 193 (1963); Weigman v. Commissioner, 47 T.C. 596, 606 (1967), affd. per curiam 400 F.2d 584 (9th Cir. 1968).

In Whipple v. Commissioner, supra, the Supreme Court held that a taxpayer's advances to one of a number of corporations he owned did not result in a deductible business bad debt under section 166 because the advances were not related to the taxpayer's trade or business (in contrast to the trade or business of the taxpayer's corporation).  The Supreme Court's reasoning in Whipple is instructive:

> Devoting one's time and energies to the affairs of a corporation is not of itself, and without more, a trade or business of the person so engaged.  Though such activities may produce income, profit or gain in the form of dividends or enhancement in the value of an investment, this return is distinctive to the process of investing and is generated by the successful operation of the corporation's business as distinguished from the trade or business of the taxpayer himself.  When the only return is that of an investor, the taxpayer has not satisfied his burden of demonstrating that he is engaged in a trade or business since investing is not a trade or business and the

> return to the taxpayer, though substantially the product of his services, legally arises not from his own trade or business but from that of the corporation. * * * [Id. at 202.]

See also Burnet v. Clark, 287 U.S. 410 (1932); Dalton v. Bowers, 287 U.S. 404 (1932); Weigman v. Commissioner, supra.

In this case, James' transfer of $650,000 to Quotum provided the necessary capital for Quotum to embark on what, with hindsight, now appears to have been an ill-advised quest for Russian airplanes. It was, however, a corporate quest in which James was only one of several participants. James' involvement in the plan was as an officer and investor. His investment of $650,000 is not deductible by him as an expense of a trade or business of his own under section 162.

Christopher has an even weaker position regarding the deductibility of his Schedule C loss. He simply gave $150,000 to his brother. His brother was supposed to invest it in the plan on Christopher's behalf. If the plan worked and a viable business resulted, Christopher thought that he might get involved in operations and that his investment would generate a profit. These facts simply do not establish that Christopher was in a trade or business for purposes of section 162, nor do they establish that his investment of $150,000 is deductible as "cost of goods sold" as claimed on his 1992 Federal income tax return.

Petitioners have failed to prove that they were engaged in a trade or business involving "international transportation" as alleged on Schedules C of their Federal income tax returns for 1992. Petitioners have conceded that they were not in the trade or business of making loans. Consequently, they are not entitled to deduct the losses claimed on their respective Schedules C for 1992.

Did Petitioners Incur Theft Losses Under Section 165(c)(2) or (3)?

Subject to certain limitations, any loss sustained during the taxable year and not compensated for by insurance or otherwise is deductible. See sec. 165(a). In the case of individuals, the losses deductible under section 165(a) are limited to (1) losses incurred in a trade or business, see sec. 165(c)(1), (2) losses incurred in any transaction entered into for profit, see sec. 165(c)(2), and (3) with respect to property not connected with a trade or business or a transaction entered into for profit, a casualty or theft loss, see sec. 165(c)(3).

As an alternate position, petitioners argue that if they are not allowed to deduct the losses claimed on their respective Schedules C attached to their 1992 returns because the losses were not incurred in a trade or business, they should be allowed to claim them as theft losses under section 165(c)(2) or (3).

Respondent asserts that petitioners have failed to prove that the requirements for a theft loss have been met.  We agree.

In order for a deduction to be allowed under section 165(a), the loss "must be evidenced by closed and completed transactions, fixed by identifiable events, and, except as otherwise provided in section 165(h) and §1.165-11, relating to disaster losses, actually sustained during the taxable year."  Sec. 1.165-1(b), Income Tax Regs.  For purposes of section 165(a), a loss arising from theft is sustained during the taxable year in which the taxpayer discovers the loss.  See sec. 165(e); sec. 1.165-8(a)(2), Income Tax Regs.  The term theft includes, but is not limited to, larceny, embezzlement, and robbery.  See sec. 1.165-8(d), Income Tax Regs.  Whether a theft within the meaning of section 165 has occurred "depends upon the law of the jurisdiction wherein the particular loss occurred."  Monteleone v. Commissioner, 34 T.C. 688, 692 (1960).

Petitioners urge us to find that a theft occurred based primarily on the fact that they did not recover the funds which were transferred to Quotum's bank account in January 1992.  They claim that they were defrauded since the funds advanced have vanished, and they never acquired any Russian airplanes. Petitioners bear the burden of proving that a theft has occurred and that the requirements of section 165 have been met.  See Rule 142(a); Allen v. Commissioner, 16 T.C. 163, 166 (1951).  In order

to carry their burden, petitioners must establish both the existence of a theft within the meaning of section 165 and the amount of the loss.  See Elliott v. Commissioner, 40 T.C. 304, 311 (1963).

In Allen v. Commissioner, supra, we described the operation of the burden of proof in theft loss cases as follows:

> Petitioner has the burden of proof.  This includes presentation of proof which, absent positive proof, reasonably leads us to conclude that the article was stolen.  If the reasonable inferences from the evidence point to theft, the proponent is entitled to prevail. If the contrary be true and reasonable inferences point to another conclusion, the proponent must fail.  If the evidence is in equipoise preponderating neither to the one nor the other conclusion, petitioner has not carried her burden.  [Id. at 166.]

The analysis described above, when applied to the facts of this case, leads to only one conclusion.

The record in this case is extremely sparse.  Although both James and Christopher testified at trial, only James was directly involved in any way in the attempt to acquire the airplanes. James' testimony at trial was quite general and not very informative.  Although he had some documents related to the airplane acquisition efforts that he introduced into evidence at trial, many of the documents were not offered or admitted for the truth of their contents.  None of the other key participants, such as Michael Donnelly, E. B. Leedy, Brian Wilcox, or a

representative of Truemax, were called as witnesses[11] to establish whether a theft occurred and, if so, the date and place of the theft.

This unsatisfying factual record does not permit us to find that a theft occurred. At most, the record in this case suggests that, of the $650,000 transferred to Quotum in January 1992, at least $42,000 was returned to James, $250,000 was paid for insurance, $70 was paid for bank charges, $72,000 was given to Truemax Sweden, and $281,000 was taken by Michael Donnelly into Russia to make a partial payment for the airplanes with James' approval. There is no proof that a theft occurred or, if it did, when it occurred or where. The record suggests only that a very risky business deal was in process and that it went sour at some point in time and for unknown reasons.

Petitioners have also failed to prove that they were the victims of any theft. The record indicates that the funds advanced by James were transferred to Quotum, a corporation, and that the funds were used, at least in part, for Quotum's business expenses. The record is devoid of evidence sufficient to

---

[11] Although some of these participants may have resided overseas and, consequently, could not be compelled to attend trial in the United States, there has been no showing whatsoever as to where these individuals resided or that they were unwilling to provide testimony. At least two of the participants, Michael Donnelly and E. B. Leedy, apparently were U.S. citizens. According to Michael Donnelly's bankruptcy file, he resided in the United States.

establish that Quotum either obtained the funds under false pretenses, embezzled the funds, or otherwise stole the funds from petitioners. Petitioners have failed to prove that Quotum obtained petitioners' funds by deception. Cf. Martin v. Commissioner, T.C. Memo. 1988-369.

Petitioners have also failed to prove for what portion, if any, of the funds advanced there was no reasonable prospect of recovery. The record suggests that a deposit of $250,000 was made toward the purchase of insurance for several Russian airplanes under contract to Quotum. The sum was allegedly paid to an insurance broker to activate insurance coverage. James testified that he was informed that the insurance deposit was refundable. Although James asserts that he attempted to obtain a refund of the $250,000 paid and that the broker refused to deal with him, there is no probative evidence that Quotum made a claim for the return of the premium, or that the claim was rejected for legally sufficient grounds.

The facts and circumstances surrounding the transfer of $150,000 to James by Christopher also fail to establish theft. Christopher voluntarily gave a check to James which was then deposited in a Michigan bank. At trial, James was unable to explain what he did with Christopher's money, and there is no proof elsewhere in the record that the money was ever transferred overseas or used in the quest for Russian airplanes.

For all of these reasons, we conclude that petitioners have failed to satisfy their burden of proving that they sustained a theft loss in 1992 within the meaning of section 165.

Do the Amounts Deducted Qualify as Business Bad Debts Under Section 166?

As another alternative argument, petitioners contend that they are entitled to a business bad debt deduction under section 166. Section 166 permits a deduction for any debt that becomes worthless within the taxable year. Nonbusiness bad debts are treated as losses resulting from the sale or exchange of a short-term capital asset. See secs. 166(d)(1), 1211(b), 1212(b). Business bad debts are deductible as ordinary losses to the extent of the taxpayer's adjusted basis in the debt. See sec. 166(b).

Petitioners base their claim to a business bad debt deduction on the promissory note allegedly executed in favor of James by Michael Donnelly and Brian Wilcox in the face amount of $611,750. The promissory note bore no interest and was payable on demand on or after February 20, 1992. It is not clear whether petitioners are contending that this promissory note supports a business bad debt deduction for both James and Christopher, nor is it clear what amount petitioners are claiming.

Whatever petitioners' contentions are concerning this issue, petitioners must first establish that (1) a bona fide debt

existed between each of the petitioners and the alleged debtors which obligated the debtors to pay petitioners a fixed or determinable sum of money, (2) the debt was created or acquired in or in connection with a trade or business of petitioners, and (3) the debt became worthless in 1992.  See sec. 166; United States v. Generes, 405 U.S. 93 (1972); Calumet Indus., Inc. v. Commissioner, 95 T.C. 257, 285 (1990); Beaver v. Commissioner, 55 T.C. 85, 91 (1970); Black v. Commissioner, 52 T.C. 147, 151 (1969).  A gift or contribution to capital is not debt within the meaning of section 166.  See Calumet Indus., Inc. v. Commissioner, supra at 284; Kean v. Commissioner, 91 T.C. 575, 594 (1988).  Petitioners bear the burden of proof on this issue. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

Our review of the record in this case confirms that petitioners have failed to prove any of the three elements necessary to establish their claim to a business bad debt deduction.  We address each of them below.

Did a Bona Fide Debt Exist?

In order for us to find that a bona fide debt was created for purposes of section 166, petitioners must prove that there was "a genuine intention to create a debt, with a reasonable expectation of repayment" and that the intention was consistent with the "economic reality of creating a debtor-creditor relationship".  Litton Bus. Sys., Inc. v. Commissioner, 61 T.C.

367, 377 (1973). Whether the requisite intention to create a true debtor-creditor relationship existed is a question of fact to be determined from a review of all the evidence. See id. Factors considered in making the analysis include (1) the names given to the certificates evidencing the indebtedness, (2) the presence or absence of a fixed maturity date, (3) the source of payments, (4) the right to enforce payments, (5) participation in management as a result of the advances, (6) the status of the advances in relation to regular corporate creditors, (7) the ratio of debt to capital of the corporation, (8) the ability of the corporation to obtain credit from outside sources, (9) the use to which the advances were put, (10) the failure of the debtor to repay, and (11) the risk involved in making the advances. See Calumet Indus., Inc. v. Commissioner, supra; Anchor Natl. Life v. Commissioner, 93 T.C. 382, 400 (1989); Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 493 (1980). No single factor is determinative, and not all factors are applicable in each case. See Dixie Dairies Corp. v. Commissioner, supra. "The various factors * * * are only aids in answering the ultimate question whether the investment, analyzed in terms of its economic reality, constitutes risk capital entirely subject to the fortunes of the corporate venture or represents a strict debtor-creditor relationship." Fin Hay Realty Co. v. United States, 398 F.2d 694, 697 (3d Cir. 1968).

Applying the above factors, we find that the advance made by James to Quotum was a capital contribution and not a bona fide loan. In exchange for the advance of $650,000, James received both a stock certificate, issued in the name of his closely held corporation, Candid, for 125 shares of Quotum's stock, and what purports to be a promissory note allegedly signed by Brian Wilcox and Michael Donnelly. The promissory note did not contain an interest provision nor was it secured; in fact, it appears from this sparse record that there was no security to offer. The advance was not made to Brian Wilcox and Michael Donnelly personally but, instead, was made directly into Quotum's bank account at Nordbanken. As further consideration for the advance, James was elected president of Quotum.

On the record before us, it does not appear that Quotum had any capital other than that provided by James. Although the promissory note on which petitioners rely had a fixed maturity date enabling James to demand payment at any time thereafter, it does not appear that Quotum had any source of repayment available other than the funds provided by James. The financial status of the two alleged debtors, Brian Wilcox and Michael Donnelly, is not in the record, except insofar as it has been established that Donnelly filed a bankruptcy petition in September 1992. It does not appear that Quotum had any ability to obtain credit from outside sources. Although some of the money advanced by James

was repaid, it appears that the repayment came from the funds transferred by James to Quotum's Nordbanken account.

In the face of competing documentation and on these facts, we conclude that James advanced the funds in exchange for an ownership interest in Quotum and a management position with the corporation. Consideration of the relevant factors leads us inescapably to the conclusion that James made a capital contribution to Quotum. As to Christopher, the record establishes only that Christopher gave $150,000 to James to invest in the quest to acquire Russian airplanes. Petitioners have failed to prove that they lent funds to Quotum or to Brian Wilcox and Michael Donnelly or that a true debtor-creditor relationship was ever established.

### Even If a Debt Was Created, Was It a Business Bad Debt?

Even if we found that a bona fide debt was created, the debt was not created in proximate relation to a trade or business of petitioners. As we concluded earlier in this opinion, the trade or business in question, if there was one, was Quotum's, not petitioners'. "When the only return is that of an investor, the taxpayer has not satisfied his burden of demonstrating that he is engaged in a trade or business". Whipple v. Commissioner, 373 U.S. at 202.

Did Petitioners Demonstrate That the Debt Was Worthless?

Petitioners contend that they have demonstrated that the alleged debt is worthless because Michael Donnelly declared bankruptcy, and the debt in question was discharged. Although bankruptcy of the debtor "is generally an indication of the worthlessness of at least a part of an unsecured and unpreferred debt", sec. 1.166-2(c)(1), Income Tax Regs., the bankruptcy of Michael Donnelly does not establish the worthlessness of the alleged debt in this case. Petitioners' argument that a bona fide debt was created is based on the promissory note allegedly executed by both Michael Donnelly and Brian Wilcox. Petitioners have made no showing whatsoever regarding the ability of Brian Wilcox to pay the balance owed under the note.

Regarding Christopher's transfer of $150,000 to James, the record shows only that Christopher's check was delivered to James after James had already transferred $650,000 to Quotum, and the check was deposited in a local bank. There is no evidence proving that James subsequently transferred Christopher's money to Quotum or used the money in an effort to obtain Russian airplanes.[12] Petitioners have not shown on these facts that Christopher could not request and obtain repayment of his advance

---

[12] James could not recall or explain what he did with Christopher's funds.

from James.  Absent such proof, petitioners have failed to establish that the alleged debt was worthless in 1992.

## Did Petitioners Sustain Capital Losses Under Section 165(f)?

Petitioners' final argument is that, at a minimum, they should be entitled to a capital loss under section 165(f). Section 165(f) provides that "Losses from sales or exchanges of capital assets shall be allowed only to the extent allowed in sections 1211 and 1212."

Since we have concluded that the advance made by James was a contribution to the capital of Quotum, we treat petitioners' argument as a claim for a capital loss attributable to worthless securities under section 165(g).  Section 165(g) provides, in pertinent part, that if any security which is a capital asset becomes worthless during the taxable year, the resulting loss shall be treated as a loss from the sale or exchange of a capital asset.  The term security includes stock in a corporation.  See sec. 165(g)(2)(A).

Petitioners' argument for a capital loss, like all of their other arguments, fails for lack of proof.  The record reflects that, in consideration of the advance of $650,000 by James, he was entitled to receive a specified amount of Quotum's stock. The stock was apparently issued to an S corporation, Candid,

Inc., in which James was a shareholder.[13]  According to James, the stock was issued in Candid's name on his lawyer's advice.

The structure that James chose for his investment in Quotum provides the framework for our analysis.  Although Candid owned the stock in Quotum which petitioners now seek to write off as worthless, petitioners did not present any evidence regarding what position, if any, Candid took concerning its ownership interest in Quotum's stock.  Petitioners did not introduce any of Candid's Federal income tax returns into evidence, nor did they prove how the alleged loss generated by the worthlessness of Quotum's stock affected, if at all, petitioners' Federal income tax returns for 1992.  Petitioners did not prove whether Candid had distributable net income or loss for 1992, nor did they prove their basis, if any, in Candid's stock.  In short, petitioners have failed to provide the necessary information to determine whether Candid had a distributable net loss for 1992 and, if so, who may claim the loss.  They have also failed to prove what their basis in Candid's stock was in 1992.

Petitioners have not argued that Candid's ownership of Quotum's stock should be disregarded.  The record is what it is; in its present state, the record is simply inadequate to support

---

[13] The testimony concerning the extent of James' ownership interest in Candid is conflicting.  See supra note 6.

petitioners' claim that they are entitled to a capital loss under either section 165(f) or 165(g).

Are Petitioners Liable for the Accuracy-Related Penalties Under Section 6662?

Respondent determined that petitioners' underpayment of tax was due to negligence or intentional disregard of rules or regulations and that, therefore, they are liable for the accuracy-related penalty under section 6662.  Petitioners dispute this determination, claiming that they relied upon the advice of their accountant in reporting the moneys paid on Schedules C to their returns and that the accountant's advice was rendered after the accountant researched applicable tax law.

Section 6662(a) authorizes the imposition of a penalty equal to 20 percent of an underpayment attributable to negligence or disregard of rules or regulations.  See sec. 6662(a) and (b)(1).  For purposes of section 6662, the term negligence includes any failure (1) "to make a reasonable attempt to comply with the provisions of * * * [the Internal Revenue Code]", sec. 6662(c), (2) "to exercise ordinary and reasonable care in the preparation of a tax return", sec. 1.6662-3(b)(1), Income Tax Regs., and (3) "to keep adequate books and records or to substantiate items properly", id.  The term disregard includes "any careless, reckless, or intentional disregard" of rules or regulations.  Sec. 6662(c); sec. 1.6662-3(b)(2), Income Tax Regs.  Section

1.6662-3(b)(2), Income Tax Regs., defines these actions as follows:

> A disregard of rules or regulations is "careless" if the taxpayer does not exercise reasonable diligence to determine the correctness of a return position that is contrary to the rule or regulation. A disregard is "reckless" if the taxpayer makes little or no effort to determine whether a rule or regulation exists, under circumstances which demonstrate a substantial deviation from the standard of conduct that a reasonable person would observe. A disregard is "intentional" if the taxpayer knows of the rule or regulation that is disregarded. * * *

The penalty does not apply, however, if the taxpayer demonstrates that he had reasonable cause for the underpayment and he acted in good faith with respect to the underpayment, as required by section 6664(c). See sec. 1.6662-3(a), Income Tax Regs.

The record in this case supports a conclusion that petitioners claimed they were in a trade or business of "international transportation" in order to obtain a dollar-for-dollar tax deduction for the funds invested in an attempt to start a new business to purchase Russian airplanes. In so doing, petitioners ignored their own documentation which, inadequate as it may be, suggests that a foreign corporation, Quotum, was the entity formed to acquire the airplanes. Petitioners' reporting position also ignored the promissory note given to James and the stock certificate reflecting that Candid, not petitioners, owned an interest in Quotum. Although petitioners' accountant testified that he researched the tax law, it appears that he did

so without reviewing or considering the documentation that petitioners had regarding their respective investments. That documentation indicated the following, all of which is inconsistent with a conclusion that petitioners engaged in two different Schedule C businesses during 1992:

(1) James' investment was transferred directly to Quotum;

(2) in exchange for that investment, James received both stock in Quotum and a promissory note. The stock was issued to James' closely held S corporation, Candid. James also became president of Quotum and actively participated in Quotum's effort to acquire Russian airplanes;

(3) Quotum apparently never acquired any airplanes or engaged in any business;

(4) at least part of the funds advanced by James was expended on business expenses of Quotum, and, to the extent so used, was not stolen, or reflective of a bad debt; and

(5) Christopher gave $150,000 to James after James had already transferred $650,000 to Quotum's account in Nordbanken. Christopher gave that amount to James to invest in Quotum; he did not use the money in his own trade or business. The record does not disclose what James did with Christopher's money.

The itemization above reflects only some of the factual reasons why we conclude that, if research was done as petitioners' accountant testified, it was inadequate and

unreliable. Either the accountant was not given the relevant facts and documents, or he ignored them. In any event, in order for petitioners to prevail on a claim that they reasonably relied in good faith on a competent return preparer, they must demonstrate that they supplied all necessary information to the preparer, they reasonably relied on the preparer's advice, and the incorrect returns resulted from the preparer's mistakes. See Weis v. Commissioner, 94 T.C. 473, 487 (1990) (dealing with the addition to tax for negligence under section 6653). Petitioners have failed to satisfy their burden of proof on this issue.

Conclusion

We have considered carefully all remaining arguments made by petitioners for a result contrary to that expressed herein, and, to the extent not discussed above, we find them to be irrelevant, unnecessary to address, or without merit. We hold on this very unsatisfying record that petitioners have failed to carry their burden of proof on any of the alternative arguments presented in this case.

To reflect the foregoing,

Decisions will be entered for respondent.